DKC 26 CV 01610

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Greenbelt Division)

USDC- GREENBELT
'26 APR 24 PM3:55

| | | |
|---|---|---|
| **Steven Anthony Goforth,** | ) | |
| 42020 Village Center Plaza, | ) | Civil Action No.: ___________ |
| Suite 120 PMB 721, | ) | |
| Aldie, Virginia 20105, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **Lyft, Inc.,** | ) | |
| a Delaware corporation, | ) | |
| 2300 Harrison Street, | ) | |
| San Francisco, California 94110, | ) | |
| | ) | |
| Defendant. | ) | |

---

## COMPLAINT

COMES NOW Plaintiff Steven Anthony Goforth ("Plaintiff" or "Mr. Goforth"), proceeding pro se, and for his Complaint against Defendant Lyft, Inc. ("Lyft" or "Defendant"), alleges and states as follows:

### I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Plaintiff Steven Anthony Goforth is a citizen of the Commonwealth of Virginia, domiciled in Aldie, Virginia.

3. Defendant Lyft, Inc. is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in San Francisco, California. Lyft is a citizen of Delaware and California for purposes of diversity jurisdiction. Lyft is registered to do business in Maryland as a foreign corporation (Maryland SDAT Department ID No. F16658494) and regularly conducts business in the State of Maryland.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this action occurred in the State of Maryland, including Plaintiff's rideshare driving activities, the wrongful deactivation of his driver account, and the injuries he sustained as a direct and proximate result of Defendant's conduct.

5. Venue is proper in the Greenbelt Division of this Court pursuant to Local Rule 501 because the events giving rise to this action occurred within the Southern Division of the District of Maryland.

## II. PARTIES

6. Plaintiff Steven Anthony Goforth is an individual residing at 42020 Village Center Plaza, Suite 120 PMB 721, Aldie, Virginia 20105. At all times relevant to this action, Mr. Goforth was a licensed and active rideshare driver contracted with Lyft to provide transportation services to passengers in the State of Maryland and surrounding areas.

7. Defendant Lyft, Inc. is a Delaware corporation with its principal place of business at 2300 Harrison Street, San Francisco, California 94110. Lyft operates a rideshare platform through which it contracts with drivers and connects them with passengers seeking transportation. At all times relevant to this action, Lyft was registered to do business in Maryland and operated its rideshare platform throughout the State of Maryland. Lyft's Maryland resident agent is The Corporation Trust Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264.

## III. FACTUAL ALLEGATIONS

### A. Mr. Goforth's Record of Service and Livelihood

8. Steven Anthony Goforth, age 58, built his livelihood as a professional rideshare driver on the Lyft platform. Over the course of his engagement with Lyft, Mr. Goforth completed more than 10,000 rides and maintained a near-perfect passenger rating of 5.0 out of 5.0 — a record that placed him among the most highly rated drivers on the Lyft platform.

9. In the period from January through April 2023, Mr. Goforth earned approximately $11,709.31 in gross income through the Lyft platform, representing an average of approximately $102.71 per day. This income constituted his primary and essential source of livelihood.

10. In addition to his rideshare driving career, Mr. Goforth operated Ridertainment Global, a technology business providing entertainment services to rideshare passengers, including registered trademarks (RideShare DJ, RideShare Radio Network), deployed iOS and Android applications, and a subscription billing program. This business was developed in connection with and dependent upon Mr. Goforth's ability to operate as a rideshare driver.

11. Prior to the events described herein, Mr. Goforth had maintained a 30-year professional career and had never previously been evicted from any residence. He had no prior disciplinary history with Lyft and no incidents of concern during his more than 10,000 completed rides.

### B. The Wrongful Deactivation on April 25, 2023

12. On or about April 25, 2023, Lyft abruptly and without advance notice deactivated Mr. Goforth's driver account, terminating his ability to drive for or receive income from the Lyft platform. This deactivation was triggered by a safety complaint submitted by a passenger.

13. Upon information and belief, the passenger who submitted the complaint triggering Mr. Goforth's deactivation had previously been identified by Lyft itself as a passenger who exploited Lyft's complaint system to obtain free ride credits. Lyft had flagged this passenger's account for prior abuse of the complaint process, yet Lyft credited the passenger's complaint against Mr. Goforth without adequate investigation and in violation of its own internal review standards.

14. The deactivation was not preceded by any warning, progressive disciplinary process, or opportunity for Mr. Goforth to respond. Lyft's action immediately stripped Mr. Goforth of his entire livelihood without due process of any kind under Lyft's own stated policies.

**C. One Hundred Eighty-Five Days of Wrongful Suspension and Daily Appeals**

15. From April 26, 2023, through October 25, 2023 — a period of 185 consecutive days — Mr. Goforth submitted daily appeals to Lyft requesting reinstatement of his driver account. Despite this persistent, documented record of appeals, Lyft failed to take meaningful action to investigate or correct the wrongful deactivation during this period.

16. During these 185 days, Mr. Goforth was completely unable to earn income through the Lyft platform. He was thereby deprived of approximately $19,001.35 in lost earnings at his established average daily rate of $102.71.

**D. Lyft's Written Admission of Wrongful Deactivation**

17. On October 26, 2023, Lyft communicated to Mr. Goforth in writing that his driver account was being reactivated. In that same written communication, Lyft admitted that the deactivation that gave rise to this action "did not meet our standards for deactivation."

18. This written admission constitutes an express acknowledgment by Lyft that the April 25, 2023 deactivation of Mr. Goforth's account was wrongful, that it violated Lyft's own internal standards, and that there was no legitimate basis for the 185-day suspension of his driving privileges and income.

19. Despite this admission, Lyft offered Mr. Goforth no compensation for the 185 days of lost income, no apology, no remediation of the financial and personal devastation wrought by its wrongful conduct, and no acknowledgment of the cascading harm that its actions had already set in motion.

**E. Financial Destruction, Eviction, and Homelessness**

20. The wrongful deactivation destroyed Mr. Goforth's financial stability entirely. Without income from the Lyft platform, Mr. Goforth exhausted his savings, fell behind on rent, and was unable to meet his basic financial obligations.

21. On August 10, 2023 — 107 days after the wrongful deactivation — Mr. Goforth was evicted from his residence in Baltimore, Maryland. This was the first eviction of his life, occurring at age 56. The eviction resulted directly and approximately from the loss of income caused by Lyft's wrongful deactivation.

22. On September 26, 2023, Mr. Goforth returned to the State of Maryland with no housing, no savings, and no income — rendered homeless by Lyft's wrongful conduct and the cascade of financial consequences that followed. The eviction on his record and the destruction of his credit made it impossible for him to secure new housing.

23. Even after Lyft reactivated his account on October 26, 2023 with its written admission of wrongdoing, Mr. Goforth remained homeless. The eviction record, destroyed credit, and

financial devastation caused by the wrongful deactivation prevented him from securing stable housing.

**F. Sleeping in His Vehicle Through the Maryland Winter and Resulting Permanent Spinal Injury**

24. Unable to secure housing, Mr. Goforth was forced to sleep in his vehicle from approximately November 2023 through February 2024 — a period of approximately four months spanning the Maryland winter, during which temperatures routinely fell into the 20s and 40s degrees Fahrenheit.

25. During this period, Mr. Goforth slept approximately 6 to 8 hours per night in a cramped vehicle, with his lumbar spine maintained in a sustained flexed and non-neutral position. This resulted in approximately 720 to 960 hours of sustained spinal compression and postural stress during the critical winter months.

26. As a direct and proximate result of sleeping in his vehicle under these conditions, Mr. Goforth developed progressive and ultimately permanent multilevel lumbar spinal stenosis — a narrowing of the spinal canal that compresses the nerves of the lower spine.

27. On November 21, 2024, a CT scan of Mr. Goforth's lumbar spine confirmed the diagnosis of permanent multilevel spinal stenosis.

28. On January 21, 2025, an MRI of Mr. Goforth's lumbar spine confirmed severe bilateral stenosis at the L3-4 level, moderate stenosis at the L2-3 level, and mild-to-moderate stenosis at the L4-5 and L5-S1 levels.

29. On October 9, 2025, Mr. Goforth's treating orthopedic surgeon recommended surgical intervention in the form of a three-level spinal fusion procedure (L2-4 TLIF/PSF), with an estimated cost of approximately $275,000. The surgeon has indicated that Mr. Goforth's condition constitutes a permanent partial disability and that left leg weakness may not improve even with surgical intervention.

30. There were no intervening causes between Lyft's wrongful deactivation and Mr. Goforth's permanent spinal injury. The unbroken causal chain runs directly from Lyft's April 25, 2023 wrongful deactivation, through the resultant financial devastation, eviction, and homelessness, to the physical conditions of car sleeping during a Maryland winter that caused Mr. Goforth's permanent spinal stenosis.

**G. Lyft's Indefensible Contradiction: The Express Drive Program**

31. In an indefensible contradiction to its claim that Mr. Goforth posed a safety concern warranting deactivation in April 2023, Lyft currently rents Mr. Goforth a company-owned vehicle under its Express Drive program and charges him approximately $250 per week — approximately $13,000 per year — for the privilege of continuing to drive for and generate revenue for Lyft.

32. Since enrolling in the Express Drive program, Mr. Goforth has completed rides using a Lyft-owned vehicle with zero safety incidents. Lyft profits from Mr. Goforth's continued labor while simultaneously having claimed, through the April 2023 deactivation, that his driving posed a safety risk to passengers.

33. Lyft's decision to provide its own vehicle to Mr. Goforth and profit from his driving is wholly irreconcilable with any genuine safety concern. This contradiction establishes that Lyft

never genuinely believed Mr. Goforth posed a safety risk and that the April 25, 2023 deactivation was unsupported by any legitimate safety basis.

### H. Arbitration Opt-Out

34. Mr. Goforth timely exercised his right to opt out of arbitration under Lyft's Terms of Service on three separate occasions: on December 19, 2024; March 3, 2026; and April 7, 2026, each time by written communication to Lyft at arbitrationoptout@lyft.com within the time period specified under the applicable Terms of Service. Mr. Goforth's right to jury trial has been preserved.

### I. Summary of Damages

35. As a direct and proximate result of Lyft's wrongful conduct as alleged herein, Mr. Goforth has suffered and continues to suffer substantial damages including, without limitation: lost earnings and income during the 185-day wrongful suspension; destruction of his business, Ridertainment Global; the eviction and destruction of his credit and rental history; costs of relocation and storage; past and future medical expenses including the cost of spinal surgery and lifetime care; future lost earning capacity as a result of permanent partial disability; physical pain and suffering; emotional distress; loss of enjoyment of life; loss of dignity and humiliation; and other consequential and incidental damages in an amount to be proven at trial, but in no event less than $75,000 and in fact substantially in excess thereof.

## IV. CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

36. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

37. The Lyft Terms of Service and related platform agreements constitute a valid and enforceable contract between Mr. Goforth and Lyft. Mr. Goforth accepted and performed under these terms throughout his engagement as a Lyft driver, including by completing more than 10,000 rides and maintaining a 5.0 passenger rating.

38. Lyft's Terms of Service and internal policies contain express and implied provisions governing the conditions under which a driver's account may be deactivated, including requirements that deactivations be based on legitimate and substantiated safety concerns evaluated through a proper review process consistent with Lyft's stated standards.

39. Lyft materially breached this contract by deactivating Mr. Goforth's account on April 25, 2023, without legitimate basis, without proper investigation, and in a manner that, by Lyft's own written admission, "did not meet our standards for deactivation."

40. As a direct and proximate result of Lyft's breach of contract, Mr. Goforth suffered damages in an amount to be proven at trial.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

41. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

42. Every contract governed by Maryland law contains an implied covenant of good faith and fair dealing that obligates each party to refrain from conduct that would deprive the other of the benefit of the agreement. This covenant applies to Lyft's contractual relationship with Mr. Goforth.

43. Lyft breached the implied covenant of good faith and fair dealing by: (a) crediting a safety complaint from a passenger that Lyft had previously identified as having a history of abusing Lyft's complaint system; (b) deactivating Mr. Goforth's account without conducting a fair and reasonable investigation; (c) maintaining the deactivation for 185 days despite receiving daily appeals from Mr. Goforth; (d) failing to provide any process by which Mr. Goforth could meaningfully challenge the deactivation; and (e) continuing to profit from Mr. Goforth's labor through the Express Drive program while sustaining the position that his deactivation was warranted.

44. Lyft's conduct deprived Mr. Goforth of the fundamental benefit of his contractual relationship — the ability to earn income as a driver on the Lyft platform — through arbitrary, capricious, and bad-faith exercise of its contractual discretion.

45. As a direct and proximate result of Lyft's breach of the implied covenant of good faith and fair dealing, Mr. Goforth suffered damages in an amount to be proven at trial.

## COUNT III
## NEGLIGENCE

46. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

47. Lyft owed Mr. Goforth a duty of reasonable care in administering its driver deactivation process, including a duty to conduct fair, thorough, and unbiased investigations before deactivating a driver's account, and a duty to adhere to its own stated standards and policies.

48. Lyft breached this duty of care by: (a) failing to conduct an adequate investigation of the passenger complaint before deactivating Mr. Goforth's account; (b) crediting a complaint from a passenger with a documented history of fraudulently exploiting the complaint system; (c) deactivating a driver with more than 10,000 rides and a perfect 5.0 rating based on an unsubstantiated complaint; and (d) maintaining the wrongful deactivation for 185 days despite daily appeals from Mr. Goforth.

49. Lyft's own written admission that the deactivation "did not meet our standards" constitutes direct evidence of negligence — a breach of the very duty of care Lyft undertook toward Mr. Goforth.

50. As a direct and proximate result of Lyft's negligence, Mr. Goforth suffered the complete and unbroken chain of harm described in the Factual Allegations above, including financial destruction, eviction, homelessness, and permanent spinal injury, all of which were foreseeable consequences of wrongfully depriving an individual of his sole source of income without just cause.

51. As a direct and proximate result of Lyft's negligence, Mr. Goforth has suffered damages in an amount to be proven at trial.

## COUNT IV
## NEGLIGENT SUPERVISION AND RETENTION

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

53. Lyft had a duty to properly train, supervise, and oversee the employees and agents responsible for conducting safety reviews and making deactivation decisions affecting its contracted drivers.

54. Lyft breached this duty by: (a) failing to implement and enforce adequate training and oversight of its safety review team; (b) permitting its safety review process to credit complaints from passengers who had been flagged for abusing that very process; (c) permitting deactivations that did not meet Lyft's own stated standards, as admitted in writing; and (d) failing to implement supervisory safeguards that would have prevented the wrongful deactivation and the 185-day failure to remedy it.

55. The fact that the deactivation "did not meet our standards," as Lyft itself admitted, establishes that the employees and agents who made the deactivation decision were operating without adequate supervision and in a manner inconsistent with Lyft's own policies and requirements.

56. As a direct and proximate result of Lyft's negligent supervision and retention, Mr. Goforth suffered damages in an amount to be proven at trial.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

57. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58. Lyft's negligent conduct, as described herein, caused Mr. Goforth to suffer severe and debilitating emotional distress, including anxiety, depression, hopelessness, and profound loss of dignity arising from homelessness, eviction at age 56 for the first time in his life, and the progressive experience of losing his career, his business, his housing, and ultimately his physical health as a direct result of Lyft's wrongful deactivation.

59. The emotional distress suffered by Mr. Goforth is accompanied and confirmed by objective physical injury — permanent multilevel spinal stenosis and permanent partial disability diagnosed by imaging studies and confirmed by surgical recommendation — directly resulting from the conditions of homelessness that Lyft's negligence caused.

60. Mr. Goforth's emotional distress was severe, ongoing, and a foreseeable result of Lyft's negligence in wrongfully depriving him of his livelihood, causing his eviction, and rendering him homeless through a Maryland winter.

61. As a direct and proximate result of Lyft's negligent infliction of emotional distress, Mr. Goforth has suffered damages in an amount to be proven at trial.

**COUNT VI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

62. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

63. Lyft's conduct, as described herein, was extreme and outrageous, exceeding all bounds tolerated by a civilized society. Specifically: Lyft deactivated a driver with more than 10,000 rides and a perfect record based on a complaint from a passenger Lyft had already flagged for system abuse; ignored 185 consecutive days of daily appeals from a man who was losing everything; admitted in writing that its conduct was wrongful; and then, having made that admission, offered no remedy, no compensation, and no acknowledgment of the devastation it had caused — while continuing to profit from that same driver's labor through its Express Drive vehicle rental program.

64. Lyft's conduct was intentional or, at minimum, reckless with respect to the probability of causing severe emotional distress to Mr. Goforth. Lyft knew, or should have known with substantial certainty, that depriving a person of their sole source of income — without legitimate basis and in violation of its own stated standards — would cause severe emotional distress, particularly when that person repeatedly communicated the impact of the deactivation through 185 daily appeals.

65. As a direct and proximate result of Lyft's intentional or reckless conduct, Mr. Goforth suffered severe emotional distress, including the experience of eviction for the first time in his life at age 56, homelessness, the loss of his career and business, and the permanent physical injury that resulted from the conditions those circumstances imposed upon him.

66. As a direct and proximate result of Lyft's intentional infliction of emotional distress, Mr. Goforth has suffered damages in an amount to be proven at trial, including punitive damages warranted by the outrageous and reckless nature of Lyft's conduct.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Steven Anthony Goforth respectfully requests that this Court enter judgment in his favor and against Defendant Lyft, Inc., and award the following relief:

**(a)** Compensatory damages for past and future lost earnings and income, including earnings lost during the 185-day wrongful suspension;

**(b)** Compensatory damages for the destruction of Plaintiff's business, Ridertainment Global, including lost business value, lost revenue, and lost intellectual property value;

**(c)** Compensatory damages for past and future medical expenses, including the cost of spinal surgery (estimated at $275,000), post-surgical rehabilitation, pain management, and lifetime care necessitated by Plaintiff's permanent partial disability;

**(d)** Compensatory damages for future lost earning capacity as a result of Plaintiff's permanent partial disability;

**(e)** Compensatory damages for costs of relocation, storage, and other expenses caused by the wrongful deactivation;

**(f)** Compensatory damages for physical pain and suffering, past and future;

**(g)** Compensatory damages for severe emotional distress, past and future;

**(h)** Compensatory damages for loss of enjoyment of life;

**(i)** Compensatory damages for loss of dignity, humiliation, and harm to personal reputation;

**(j)** Punitive damages in an amount sufficient to punish Defendant for its willful, wanton, and outrageous conduct and to deter similar conduct in the future;

**(k)** Pre-judgment and post-judgment interest at the applicable legal rate;

**(l)** Such other and further relief as this Court deems just and proper.

## VI. JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Steven Anthony Goforth hereby demands a trial by jury on all issues so triable. Plaintiff has timely and validly opted out of the arbitration provision in Lyft's Terms of Service on three separate occasions and expressly preserves his right to trial by jury.

Respectfully submitted,

______________________________

Steven Anthony Goforth, Pro Se
42020 Village Center Plaza
Suite 120 PMB 721
Aldie, Virginia 20105
Email: theuppityninja@gmail.com

Date: April 24, 2026

## VERIFICATION

I, Steven Anthony Goforth, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned matter, that I have read the foregoing Complaint, and that the facts alleged therein are true and correct to the best of my knowledge, information, and belief.

______________________________

Steven Anthony Goforth

Date: April 24, 2026