**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| STEVEN ANTHONY GOFORTH, and RIDERTAINMENT LLC (Count VII only),<br><br>Plaintiffs,<br><br>v.<br><br>LYFT, INC.,<br><br>Defendant. | Civil Action No. 8:26-cv-01610-DKC<br><br>**JURY TRIAL DEMANDED**<br>Hon. Deborah K. Chasanow |

## FIRST AMENDED COMPLAINT

Plaintiff Steven Anthony Goforth ("Plaintiff" or "Mr. Goforth"), proceeding pro se, files this First Amended Complaint against Defendant Lyft, Inc. ("Lyft" or "Defendant"). He files it as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B) or, in the alternative, under Rule 15(a)(2) and Local Rule 103.6 with the Court's leave, which he requests by the accompanying motion. RiderTainment LLC joins as a plaintiff on Count VII only and will appear through counsel. This First Amended Complaint supersedes the Complaint filed as ECF 1, and alleges and states as follows:

## NATURE OF THE ACTION

1. Plaintiff alleges that Lyft is liable to him because it wrongfully deactivated his driver account on a passenger's alleged report, in breach of the notice-and-cure terms it wrote into its own contract. He alleges that Lyft is liable for what followed, because 185 days without income cost him his housing, drove him into his vehicle, and caused, or substantially aggravated, a lumbar spinal condition, and a federal agency has found him disabled. And he alleges that Lyft cannot defend the deactivation, because it overturned it on the same record. Count VII is the claim of RiderTainment LLC that Lyft's wrongful deactivation was also a tortious interference that destroyed the business Mr. Goforth was building. Count VIII states Plaintiff's claims that

Lyft discriminated against him on the basis of race and disability and denied him notice and his app data.

## I. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. It also has jurisdiction under 28 U.S.C. § 1331 over the claims in Count VIII that arise under 42 U.S.C. § 1981 and 42 U.S.C. § 12184, and supplemental jurisdiction under 28 U.S.C. § 1367(a) over the claims that arise under Maryland law.

3. At the time this action was filed, Plaintiff Steven Anthony Goforth lived in Virginia. For purposes of 28 U.S.C. § 1332, Plaintiff was a citizen of the Commonwealth of Virginia at the time this action was filed, and citizenship for diversity purposes is determined as of that time. RiderTainment LLC is a limited liability company whose sole member is Controlling Member Steven A. Goforth, and it takes his citizenship: it is a citizen of Virginia.

4. Defendant Lyft, Inc. is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in San Francisco, California. Lyft is a citizen of Delaware and California for purposes of diversity jurisdiction. Lyft is registered to do business in Maryland as a foreign corporation (Maryland SDAT Department ID No. F16658494) and regularly conducts business in the State of Maryland.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this action occurred in the State of Maryland.

6. The Greenbelt Division is the proper division under Local Rule 501.4.c because no party is a resident of Maryland and the events giving rise to this action occurred within the Southern Division of the District of Maryland.

## II. PARTIES

7. Plaintiff Steven Anthony Goforth is an individual whose litigation mailing address is 42020 Village Center Plaza, Suite 120-721, Aldie, Virginia 20105. When Lyft told him on April 25, 2023 that his account was on hold, Mr. Goforth was an active rideshare driver contracted with Lyft to provide transportation services to passengers in the State of Maryland and surrounding areas. He remains a Lyft driver today. Mr. Goforth is now disabled, as the Social Security Administration has found (61). Before the wrongful deactivation, Mr. Goforth had never been treated for a spinal condition. In 2024, in a letter to Lyft's Legal Department, Mr. Goforth asked Lyft to compensate him for the earnings he lost during the wrongful deactivation. Lyft did not respond.

7A. Plaintiff RiderTainment LLC is a Florida limited liability company, and it is the plaintiff on Count VII only. Controlling Member Steven A. Goforth is its sole member. As Local Rule 102.2.a requires, its name is RiderTainment LLC, and the last address shown for it in Plaintiff's Exhibit 3 is 1931 Cordova Rd, Suite 3094, Fort Lauderdale, Florida 33316, in Broward County, Florida. Under Local Rule 101.1.a, RiderTainment LLC may appear only through counsel, and it will do so. Controlling Member Steven A. Goforth does not represent it and signs nothing on its behalf. Its counsel will state its current address and county on appearing.

8. Defendant Lyft, Inc. is a Delaware corporation with its principal place of business at 2300 Harrison Street, San Francisco, California 94110. Lyft operates a rideshare platform throughout the State of Maryland, through which it contracts with drivers and connects them with passengers seeking transportation. Lyft's Maryland resident agent is The Corporation Trust Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264.

## III. FACTUAL ALLEGATIONS

### A. Mr. Goforth's Record of Service and Livelihood

9. Steven Anthony Goforth built his livelihood as a professional rideshare driver on the Lyft platform. By April 25, 2023, he had completed more than 10,000 rides and held a passenger

rating of 5.0 out of 5.0, the highest rating a driver can hold on the Lyft platform. A driver's rating reflects the passengers' opinion of the driver, not Lyft's.

10. In the period from January through April 2023, Mr. Goforth earned approximately $11,709.31 in gross income through the Lyft platform, an average of approximately $102.71 per day. This income was his primary and essential source of livelihood.

11. In addition to driving, Mr. Goforth operated RiderTainment LLC, doing business as the RideShare Radio Network, a technology business providing entertainment services to rideshare passengers. The business includes trademark and service-mark applications that Mr. Goforth filed and paid for, which are under review at the United States Patent and Trademark Office (RideShare DJ, RideShare Radio Network), deployed iOS and Android applications, and a subscription billing program. He designed the marks and logos himself. The business was developed in connection with, and depended upon, his ability to operate as a rideshare driver.

12. Before the events described here, Mr. Goforth had maintained a 30-year professional career and had never been evicted from any residence. Over more than 10,000 completed rides, Lyft had from time to time contacted him about passenger reports. Those reports arose from rides in which Mr. Goforth held riders to Lyft's own policies or protected his own safety, for example by declining passengers who lacked a child seat or ending a ride when a passenger threatened or touched him. Upon information and belief, in those early years Lyft had no means of telling a passenger who was retaliating against a driver for upholding Lyft's policies from a genuine safety concern, and drivers absorbed complaints and warnings for enforcing Lyft's own rules. Each earlier hold ended with Lyft lifting it and returning Mr. Goforth to the platform, and none led to lasting action against his account (paragraphs 30 through 34).

**B. RiderTainment LLC and the Rideshare DJ Mobile App**

13. Mr. Goforth organized RiderTainment LLC as a Florida limited liability company in March 2021 (Plaintiff's Exhibit 3), and is its sole member and Controlling Member. RiderTainment LLC is a separate entity from Mr. Goforth, and it is the plaintiff on Count VII

only. The Internal Revenue Service assigned the company an Employer Identification Number, ending 5452, in March 2021 (Plaintiff's Exhibit 3). In 2021, RiderTainment LLC paid the ASCAP music license fee for the RideShare Radio Network for the following year (Plaintiff's Exhibit 3).

14. The Rideshare DJ Mobile App (the "App") was made for the driver's seat. It streamed music around the clock and, between tracks, played short audio messages to passengers: reminders to tip the driver and short reminders about ride safety and privacy. Eleven original hosted shows ran alongside the music (Plaintiff's Exhibit 4). Mr. Goforth was the only human host; the other hosts were AI hosts he built and administered. Drivers could use a free stream or subscribe to a premium stream, and an affiliate program, built and in testing, was designed to let affiliates earn by introducing other drivers. Mr. Goforth built the App because ride offers to drivers were falling, and drivers needed a way to earn more from the rides they were still given. The App was designed to help drivers earn larger and more frequent tips.

15. Mr. Goforth saw where the industry was going. He knew driverless vehicles were coming, and that a vehicle with no driver has no one to keep music, news, or conversation going. Rideshare drivers regularly do that work. He built the App with that future in mind.

16. The App also supported the RideShare Radio Network, a channel through which a rideshare company, including Lyft, could speak directly to drivers and their passengers about rider safety, conduct, and more. Mr. Goforth, a highly experienced driver who held a five-star rating over more than 10,000 rides, built it and anticipated partnering with Lyft.

17. The App was in its rollout and testing phase. Mr. Goforth was running live trials inside real Lyft rides with real passengers. He was testing the App's downloads from Apple's App Store and Google Play, its compatibility across versions of the Apple and Android operating systems, and email campaigns that compared responses to variations of each message. The affiliate program was built and in testing: no one had replied, and activation was planned once the tests passed. When Lyft told him on April 25, 2023 that his account was on hold, the rollout stopped, he lost access to those riders for 185 days, and he was unable to fund or grow the App.

18. During rides, passengers heard only the RideShare Radio Network, its music and station identifications. Some remarked that they liked what they heard and asked what it was. Mr. Goforth told them only that it was the RideShare Radio Network, and he did not discuss the App, its download, or the affiliate program during the ride. When the ride ended, he switched the Lyft driver app to its offline position, so that no new ride request would interrupt the conversation. The ride was over and he was offline. The person was no longer a passenger but a potential affiliate, asking about a business. Many opened their phone's app store while still talking with him and began downloading the App on their own phones. When they asked more, he told them about the affiliate program as a way to offset the cost of rides, and he referred only to "rideshare," never to Lyft or Uber. Looking at a download on another person's phone cannot be done while driving, so all of this took place only after the ride had ended and he was offline. Mr. Goforth owned one Android test device and one Apple test device. Downloads on the potential affiliates' own phones showed him how the App looked and behaved on hardware and operating-system versions he did not own, and he found flaws and layout differences from one version to the next. The hold ended that testing.

19. At the time of the April 25, 2023 hold, the App was available for sale at https://ridesharedj.com. Mr. Goforth has preserved the website as archived captures, for evidentiary purposes only. The first is a copy stored on Netlify: https://ridesharedj.netlify.app/ridesharedj.com/index.html. (This link is not a working website. It is a historical snapshot of the original ridesharedj.com website, stored on Netlify, a web-hosting service, solely to preserve evidence of what existed before the business was destroyed. The original website is no longer hosted. Nothing at this link functions for sales, service or support.) The second is a capture from the Wayback Machine of the Internet Archive: https://web.archive.org/web/20260903200754/https://ridesharedj.com/. The captures show what RiderTainment LLC built and offered under the names the Rideshare DJ Mobile App and the RideShare Radio Network: the App, a free standard stream, a paid premium subscription, a test form for the affiliate program, and eleven hosted shows.

20. Mr. Goforth retains records of the cost of building and running the business, data for the App as hosted on Google Play and the Apple App Store, and the marketing materials used, or prepared for use, with rideshare drivers. His marketing video and users guide are described in Count VII. The complete transcript of the marketing video is Plaintiff's Exhibit 2, Part 1 (pages 1 to 2 of 7), a summary of the users guide is Plaintiff's Exhibit 2, Part 2 (pages 3 to 7 of 7), and the marketing postcard is Plaintiff's Exhibit 2, Part 3 (page 7 of 7). He can make the other materials available to Defendant's counsel on request. After the wrongful deactivation, the financial ruin that followed, and his resulting physical disability, Mr. Goforth could no longer fund or grow the business.

21. Mr. Goforth's plan to market the App to drivers centered on a printed postcard that offered a free trial by QR code, described the App's round-the-clock music, automated tip reminders, and affiliate income, and was to be handed to drivers waiting in rideshare lots at airports across the country. That marketing required him to walk from car to car, and his disability, which followed the wrongful deactivation and the homelessness that came after it, has made that impossible. The card never reached drivers. It is Plaintiff's Exhibit 2, Part 3 (page 7 of 7).

**C. The Wrongful Deactivation**

22. On April 25, 2023, Lyft told Mr. Goforth that his driver account was on "hold" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*, without advance notice, ending his ability to drive for or receive income from the Lyft platform. Mr. Goforth alleges that the "hold" was a deactivation disguised as a hold. Putting an account on hold fits the Terms, but no investigation followed, which fits a deactivation already decided. He wrote to Lyft on April 26 and May 3, 2023, and Lyft never acknowledged, responded to or answered either message (Plaintiff's Exhibit 1, Pages 3 and 5 of 20). Section 16 of the Terms provides that "you will be given notice of the potential or actual deactivation and an opportunity to attempt to

cure the issue to Lyft's reasonable satisfaction prior to Lyft permanently terminating the Agreement" (ECF 20-4 at 25). The account stayed closed for 185 days.

23. Mr. Goforth alleges that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* submitted a report about the ride, which Lyft never showed him, and that Lyft's description of it changed from message to message. On April 25, 2023, Lyft wrote that it "can't assist with deactivation reviews of this nature" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*. On May 3, 2023, it described the alleged comments only as "discriminatory" and the reaction of the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* as feeling "uncomfortable and discriminated" *[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]*. On May 6, 2023, it wrote that it had "reviewed the details associated with your deactivation" and that it was acting on "this not being the first time we receive a report regarding similar behavior on your account" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. On October 27, 2023, it wrote: "After further reviewing the allegations and your entire history on the platform, we have decided to overturn this decision and reactivate your account" *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*. Lyft never put the alleged comments in context for him.

23A. A Lyft support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* told Mr. Goforth, in confidence and in substance, that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* has a history of doing this to drivers (46A). Mr. Goforth does not know when Lyft first learned that history. Upon information and belief, that history includes using Lyft's complaint process to obtain free ride credits. In the alternative, Mr. Goforth alleges that no genuine report was made, or that Lyft used one to remove him for a purpose it has never disclosed.

24. Lyft placed the hold without telling Mr. Goforth what was alleged and without any opportunity for him to respond before his income was cut off. The hold immediately stripped

him of his entire livelihood. Lyft's April 25, 2023 email said that it would send "more details soon," that most cases "can be responded to within the business day," and that Lyft "can't assist with deactivation reviews of this nature" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*.

25. In writing, Lyft did not tell Mr. Goforth what the report alleged until May 3, 2023, nearly eight days after the hold *[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]*. Mr. Goforth answered the allegation the same day (paragraph 25A).

25A. Mr. Goforth answered at 1:51 PM on May 3, 2023. He wrote that he is "a supporter of the LGBTQ+ community," that he "just wish[ed] it was equal," that this type of incident would never happen again, and that "I maintain my innocence and I am not taking responsibility for the passengers misunderstanding of the conversation I was having" (Plaintiff's Exhibit 1, Page 5 of 20). Mr. Goforth alleges that he wrote it pleading for mercy, to appease the threat of deactivation, having been the subject of a false report by a passenger before. By "will never happen again" he meant that he would stop speaking with passengers at all, however friendly, and drive them from A to B in silence, so that no one could say he had spoken and there would be no dispute over what was said.

26. Mr. Goforth alleges, on information and belief, that Lyft did not investigate the report before it acted. Its May 3, 2023 email identified no words Mr. Goforth was said to have spoken, and Lyft did not ask him for his account before the April 25, 2023 hold. Lyft treated how the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* felt as proof of what Mr. Goforth did. Lyft's own words show that the deactivation was decided at the start: on April 25 it wrote of "deactivation reviews of this nature" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*, and on May 6 it wrote that it had "reviewed the details associated with your deactivation" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. Mr. Goforth alleges that his messages of April 26 and May 3 were attempts to cure something Lyft had already concluded, and that the notice and cure that Section 16 of the Terms promises never operated for him.

26A. Lyft told Mr. Goforth twice that the Driver Hub and its local office were not available to him, and on May 6, 2023 it gave him directions about his payout and a trademark instruction *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]* (Plaintiff's Exhibit 1, Pages 2 and 8 of 20). Mr. Goforth alleges, on information and belief, that between April 25 and May 6, 2023, the only people involved in his fate were the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* and the Lyft individuals behind the deactivation. He alleges that Lyft's words show the case was closed and he was being given directions, that he was led to believe it was a hold, and that the deactivation took place at the level of the report.

27. Lyft's Terms of Service, filed in this case as ECF 20-4 (the "Terms"), state that Lyft collects a driver's precise location and the dates and times of his use of the platform, and that users may choose to send Lyft in-ride recordings initiated through the Lyft app (ECF 20-4 at 45 to 46). Lyft therefore held data about the April 25, 2023 ride, including its time, route and location. Upon information and belief, Lyft did not review that data before it placed the hold. Mr. Goforth will seek in discovery the ride data for that trip and any recording of it, including whether the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* started one.

27A. The same Terms mean that Lyft may have captured the RideShare Radio Network playing in the vehicle, and passengers' unprompted positive remarks about it, before any passenger knew that Mr. Goforth had created it. Passengers said it was a great idea, asked how to learn more, and said, "whoever created this is going to make millions." Mr. Goforth does not allege that Lyft captured any of it; whether it did is a matter for discovery. He alleges that Lyft had regular opportunities to learn of RiderTainment LLC and the Network, from the testing phase through the launch, every time he drove, seven days a week for the hours he was online.

28. Mr. Goforth's account of the conversation is as follows. The passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* began a conversation about history and equality. Mr. Goforth said, in substance, that politicians have often favored one

group over another, that the nation has made progress, and that he wished treatment were equal for everyone. He mentioned the LGBTQ+ community as a group that now has political power, said he supported it, and said he hoped someone from that community would one day win the White House and be fair and equal to all people. He wished that community the best result and change. His written account to Lyft on May 3, 2023 (Plaintiff's Exhibit 1, Page 5 of 20) records that he told the passenger he "just wish[ed] it was equal" and that he is "a supporter of the LGBTQ+ community". As she left the vehicle, the passenger told him it was nice meeting him and that she had enjoyed the conversation. Mr. Goforth has family members in the LGBTQ+ community, has served LGBTQ+ customers as a barber for decades, and counts members of that community among his closest friends. Lyft's notice did not name the passenger who reported him. Mr. Goforth deduces that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* was the person who reported him, because she was the only passenger who engaged him in conversation at that time. The deduction is his own and is not a Lyft record. Lyft never put the alleged comments in context for him.

29. In July 2023, after Mr. Goforth again disputed the decision, Lyft told him three times on July 14, 2023, in nearly identical words and with no new reasoning, that the decision to deactivate his account "will remain final." *[Specialist from Lyft safety Department, Jeremy (the body of the email says "Jeremiah"), July 14, 2023, 9:25 AM, 2:40 PM and 3:31 PM Pacific]*

**D. Lyft's Handling of the Four Earlier Holds and the April 2023 Hold**

30. Between April 2019 and August 2022, Lyft placed Mr. Goforth's account on hold four times. Each hold followed a report that Mr. Goforth understands to have been false. Each time, Lyft investigated, notified him and communicated with him under the Terms, and lifted the hold within about 28 hours. Mr. Goforth did not appeal any of the four holds. Each cost him about a day's pay. All he expected was that all parties would abide by the Terms. The hold dates, the allegations and Lyft's messages are collected in Plaintiff's Exhibit 1, Pages 1 to 17 of 20.

31. April 2019: Lyft spoke with Mr. Goforth by telephone and reactivated his account about 13 hours after the hold.

32. October 2020: Lyft stated the allegation about 1 hour 47 minutes after the hold, attempted to reach Mr. Goforth by telephone, and reactivated his account about 28 hours after the hold.

33. November 2021: Lyft answered Mr. Goforth within 24 minutes and reactivated his account about 13 hours after the hold.

34. August 2022: Lyft placed a hold after Mr. Goforth himself reported a passenger. About 26 hours later Lyft wrote that "it appears your account deactivation was processed in error" and that it had reactivated his account. *[Lyft, position not stated in the email, Quinto, August 9, 2022, 10:36 AM Pacific]* Lyft's email calls the hold a "deactivation".

35. On April 25, 2023, when Lyft placed the hold, it wrote that "[a] specialist from our Trust and Safety team will be assigned to your case," who would "reach out by phone and email and keep you up to date," and that "[m]ost cases can be responded to within the business day." *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*

36. On April 25, 2023, Lyft placed the hold and sent that acknowledgment. Lyft's next message came 7 days 18 hours later, on May 3, and began "I apologize for the late response". *[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]* On May 6, 10 days 16 hours after the hold, Lyft told Mr. Goforth the deactivation was permanent. *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*

37. Over the 185 days, Lyft sent eight messages, none between July 14 and October 26, 2023, a gap of more than 103 days. Lyft reactivated the account on October 27, 2023, on substantially the same record (46).

38. Mr. Goforth is a Black man. On April 25, 2023, he was 55 years old, having turned 55 the year before. At 55, a person is of "advanced age" under the Social Security Administration's own regulation (20 C.F.R. § 416.963(e)). Mr. Goforth understands the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as*

*female]* to be the person who reported him that day (28). He was also the driver on each ride involved in the earlier holds, and none of those passengers was a young Caucasian female.

39. Before April 25, 2023, Lyft telephoned Mr. Goforth in connection with the earlier holds. From April 25, 2023 until the reactivation on October 27, 2023, Lyft did not telephone him and wrote to him only by email.

**E. One Hundred Eighty-Five Days of Wrongful Deactivation and Regular Appeals**

40. For 185 days, from the April 25, 2023 hold until the account was reactivated on October 27, 2023, Mr. Goforth regularly submitted appeals to Lyft requesting reinstatement of his driver account. Despite this documented record of appeals, Lyft's acts and omissions left the wrongful deactivation in place: Lyft took no meaningful action to investigate or correct it during this period.

41. During the 185 days, Lyft's support representatives told Mr. Goforth, in substance, that the decision was final, that every other representative would tell him the same, and that contacting Lyft again was useless. More than one representative said so. None told him what was reviewed or whether anyone looked into the passenger's *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* report. None told him who made the decision, other than a May 6, 2023 statement that one representative had "reviewed the details associated with" the deactivation. *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]* Lyft has still not told him.

42. The alleged accusation stayed with Mr. Goforth throughout the 185 days. He kept contacting Lyft because he understood the report to be false and wanted it corrected.

43. During these 185 days, Mr. Goforth was completely unable to earn income through the Lyft platform. He was thereby deprived of his earnings at his established average daily rate of approximately $102.71.

**F. Lyft Overturns Its Decision**

44. Lyft never acknowledged, responded to or answered what Mr. Goforth wrote on April 26 and May 3, 2023. On or about October 26, 2023, he contacted Lyft again. Lyft wrote that it had "passed these concerns along to the team that can assist you further," that "[a] member of this team will be reaching out to you shortly," and that if there was anything else he wished to tell Lyft he should respond directly to the message. *[Lyft Support, Celidey, October 26, 2023, 1:02 AM Pacific]* He told Lyft that he had made no negative remark about the LGBTQ+ community, that he supports it, and that the report was false. On October 27, 2023, Lyft's Trust and Safety team overturned the decision.

45. On October 27, 2023, Lyft's Trust and Safety team wrote to Mr. Goforth that his account "was permanently deactivated" in May 2023 over alleged violations of Lyft's terms of service, and that "[a]fter further reviewing the allegations and your entire history on the platform, we have decided to overturn this decision and reactivate your account." *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*

46. Lyft's decision to overturn rested on the same alleged report by the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* and the same platform history Lyft had held throughout. The only addition Mr. Goforth knows of was his own account on October 26, 2023 (44), which repeated the denial he had put in writing to Lyft on May 3, 2023. Lyft's October 27 message identifies no other new fact; it says Lyft reviewed "the allegations and your entire history on the platform" (45). The overturn came more than three months after Lyft told Mr. Goforth, three times in one day, that its decision "will remain final."

46A. On October 27, 2023, or within a day after, a Lyft support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* telephoned Mr. Goforth to confirm that his account was working as reactivated and to tell him that reactivation can take a little time to take effect. Mr. Goforth took the opportunity to ask how this could have happened to him and gave his tenure, his ride count and his 5.0 rating. The

specialist told him, in confidence and in substance, that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* has a history of doing this to drivers. Mr. Goforth does not know when Lyft first learned that history. The specialist also told him, in substance, that Lyft had since changed how it reviews complaints: the first-tier representative who hears a complaint no longer has authority to deactivate a driver, that representative gathers the information and sends it to a higher-tier group for a second review, and a driver is deactivated only if that group clears it. The specialist offered this as assurance that it would not happen again to him or to any driver, because Lyft's chief executive and management had made corrective changes.

47. The Terms treat a driver's falling below a star rating threshold as a ground for deactivation (ECF 20-4 at 25). Mr. Goforth held a 5.0 rating across more than 10,000 rides. That record earned him no consideration when Lyft placed his account on hold, and none for the 185 days that followed. Only in October 2023 did a Lyft reviewer look at the whole of his history and reach a different result.

48. Lyft offered Mr. Goforth no compensation for the 185 days of lost income, no apology, and no remediation.

**G. Financial Destruction, Housing Loss, and Homelessness**

49. The wrongful deactivation destroyed Mr. Goforth's financial stability. Without income from the Lyft platform, he exhausted his savings, fell behind on rent, and was unable to meet his basic financial obligations. His credit was destroyed.

50. Mr. Goforth's first housing loss came in the first week after the hold. He paid his Baltimore landlord through Cash App. When his income stopped, the payments stopped, and the landlord, after hearing his story, told him by text and in person that he had to leave if he could not pay. Mr. Goforth was 55. It was the first time in his life he had lost his housing.

51. During the suspension, Mr. Goforth qualified for a government-supported low-income housing program and moved into an apartment in San Antonio, Texas, using the small

reserve he had from his final week of driving, hoping to stabilize in a less expensive market. He could not keep it stable. His tires were bald, repairs were needed, and the alternative work he turned to, barbering, his earlier profession, could not build a clientele fast enough to pay the rent in full. Apartment management gave him notices to pay or vacate for inability to pay in full. The rent had fallen behind while his account was deactivated. After Lyft reactivated his account, he could not catch up, and at age 56 he gave up the apartment and moved into his vehicle. Mr. Goforth left both homes without waiting for a court filing. He had never been through an eviction, he wanted to keep one off his record while he looked for a way to support himself, and he would not use the court process to buy more time at the expense of the people and the company that had given him shelter.

52. With no housing, no savings, and no income, Mr. Goforth was rendered homeless by Lyft's wrongful conduct and the cascade of financial consequences that followed. He lived in his vehicle in Orlando, Florida and in Columbia, Maryland. The loss of his housing and the destruction of his credit made it impossible for him to secure new housing.

53. Lyft's reactivation of his account in late October 2023 did not undo the harm. The rent that went unpaid during the 185 days (51) was still owed when Lyft reactivated his account. After reactivation, Mr. Goforth drove for Lyft in the vehicle he was living in, on low-paying ride offers, and Lyft took its share of every ride.

54. At the time the original Complaint was filed, an eviction action had been brought against Mr. Goforth in Virginia. That third housing loss ended in an eviction that is now a public court record of money owed to a landlord, and any future landlord can find it easily. Since the wrongful deactivation, Mr. Goforth has lost three homes, and as of this filing he has none.

**H. Sleeping in His Vehicle and the Resulting Spinal Injury**

55. Unable to secure housing, Mr. Goforth was forced to sleep in his vehicle, in Orlando, Florida and in Columbia, Maryland, from approximately November 2023 through approximately February 2024, a period of approximately four months. He left Orlando for Columbia because

ride rates in Florida were too low for him to climb out of homelessness, and the Washington area paid more.

56. He slept in the front seat, in short stretches, sitting partly upright. The nights were cold, and his bedding was damp and would not dry. The cold woke him again and again, and he would run the car briefly to warm it and then try to sleep again. He was on constant watch for strangers approaching or knocking on the vehicle, and for being told to move on from where he had parked. This went on for months.

56A. Mr. Goforth has preserved the commercial storage records and receipts for his belongings. They show where his belongings were stored as he moved, and they corroborate the timeline of his stays described in this Complaint.

57. Mr. Goforth alleges that these conditions caused, or substantially aggravated, the multilevel lumbar spinal stenosis and left-sided radiculopathy (nerve-root compression) with which he has since been diagnosed, a narrowing of the spinal canal that compresses the nerves of the lower spine.

58. On November 21, 2024, through Inova's emergency department, a CT scan of Mr. Goforth's lumbar spine was performed for acute left lumbar pain radiating into the front of his left leg to the knee. The report described degenerative changes in the lumbar spine, greatest at L2-L3 and L3-L4, with associated central canal and foraminal narrowing.

59. An MRI of Mr. Goforth's lumbar spine in January 2025, and an MRI and a CT scan on October 31, 2025, showed multilevel lumbar stenosis, most pronounced at L3-L4. The October MRI report compared its findings with the January study and described them as unchanged.

60. On July 3, 2025, Mr. Goforth's treating orthopedic surgeon determined that he had exhausted conservative treatment and was a candidate for a three-level lumbar fusion (L2-4 TLIF/PSF), and told him that the primary goal of the surgery is to treat his radicular pain and that his left leg weakness may not improve. The surgeon submitted a surgical posting for the L2-L4 fusion on August 7, 2025.

61. The Social Security Administration found Mr. Goforth disabled as of December 28, 2024. SSA placed him on its long-term review schedule, a review in five to seven years, which its regulation reserves for cases in which medical improvement is not expected (20 C.F.R. § 416.990(c), (d)). SSA's award letter states: "While we realize that your health may not improve, we must review all disability cases. Therefore, we will review your case in 5 to 7 years." (Notice of Award, Aug. 6, 2026, p. 6.) *(Plaintiff's Exhibit 5, Page 3 of 3, Notice of Award)*

62. In July 2026, Mr. Goforth's treating orthopedic surgeon advised in writing that surgical treatment had been discussed, that further testing is required before surgery, that total recovery is likely to take about three to four months, and that stable, clean, safe, and permanent housing is medically necessary for a successful recovery. The surgeon advised that temporary housing in a hotel is not sufficient or recommended for post-surgical recovery and care.

63. The loss of Mr. Goforth's income, his housing, and his ability to rest safely began with Lyft's April 25, 2023 hold and the wrongful deactivation that followed. The conditions that followed caused, or substantially aggravated, his spinal condition.

64. Lyft cut off Mr. Goforth's income on April 25, 2023 (22). In the first week, his landlord told him he had to leave if he could not pay (50). The rent that fell behind during the 185 days followed him afterward and kept him from catching up (51), and the loss of his housing and the destruction of his credit kept him from securing another home (52). The nights in his vehicle followed (55 and 56). Lyft knew the stakes, because on May 3, 2023 Mr. Goforth told Lyft in writing that "Lyft is my only income" (Plaintiff's Exhibit 1, Page 5 of 20). Each of the four earlier holds on his account ended within about 28 hours (30).

65. To this day, Mr. Goforth has not been able to stabilize his life since the 2023 wrongful deactivation. His spinal condition limits his ability to work, and he cannot earn enough to support himself.

**I. The Report and Section 16**

66. Lyft placed Mr. Goforth's account on hold in April 2023, and made the deactivation permanent, on an alleged report by the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* that she felt uncomfortable during a conversation.

67. Lyft's May 3, 2023 message described the alleged report as "making discriminatory comments about the LGBTQ+ community during a ride, making a passenger feel uncomfortable and discriminated." *[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]* Mr. Goforth denies it (28). No Lyft message says he endangered anyone. On May 6, 2023, Lyft wrote of "alleged violations of Lyft's Terms of Service." *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]* A passenger's discomfort is a feeling, not a safety event.

68. Lyft placed the matter with its Safety team, and on May 6, 2023 told Mr. Goforth that "[o]utreach to other members of the Safety team will not reverse this decision." *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]* Lyft moved an alleged report of a passenger's discomfort into a category the report did not describe, and in doing so set aside the notice and opportunity to cure that Section 16 of the Terms promises (ECF 20-4 at 25). Lyft later overturned the decision on substantially the same record (46). For 185 days he had no income, and the loss of his housing followed (49 through 54). The wrongful deactivation caused him financial harm, psychological harm, severe duress, and a spinal condition that the resulting conditions caused or substantially aggravated (57).

68A. During the 185 days Mr. Goforth lost his Baltimore housing (50), and the San Antonio apartment followed (51). He paid what he could on the monthly terms of his vehicle so that he would have shelter at night, a choice forced on him by not earning what he had earned on the Lyft platform. He later lost the vehicle in a Chapter 7 bankruptcy filed in 2024. That bankruptcy was a needed form of relief and a financial sacrifice that could not be avoided after the losses that began with the wrongful deactivation. The chain of losses that began with the

wrongful deactivation ran through the loss of his income and his housing to a debilitating spinal injury and loss of mobility (57, 63).

69. Mr. Goforth now drives with a disability. Lyft's platform gives a driver no way to let passengers know that he has one. Passengers commonly expect a driver to get out on arrival and help with luggage, groceries, and other belongings, and a disabled driver who cannot do so can be rated low or reported as unhelpful or aggressive, without the passenger knowing why. Upon information and belief, Lyft has made no accommodation for its disabled drivers, and a low rating or a passenger complaint is what Lyft's own policies treat as grounds for deactivation.

69A. On August 2, 2025, Lyft Support answered Mr. Goforth's request about cancelling assisted rides that require him to lift heavy items. The reply said that "we are unable to make any exclusions to your acceptance rate" and acknowledged "a missing feature to help disabled drivers service a ride request more smoothly." *[Lyft Support, Maria, August 2, 2025, 8:51 AM Pacific]* The email states no referral of his request to the department that handles accessibility and disability, and no follow-up. *(Plaintiff's Exhibit 1, Page 19 of 20, Lyft Support's August 2, 2025 reply)*

69B. Mr. Goforth alleges that the conduct described in ¶69 and ¶69A also violates Title III of the Americans with Disabilities Act, 42 U.S.C. § 12184(a), which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." One court has found it plausible that a ride-share company is such an entity. Equal Rights Center v. Uber Technologies, Inc., No. 17-cv-1272 (KBJ), slip op. at 33 to 38 (D.D.C. Mar. 15, 2021). Disability is also a ground protected by Md. Code, State Gov't § 20-304 (Count VIII, 8b).

69C. Lyft gives passengers no notice that a driver has a disability, and passengers commonly judge drivers by how readily they get out to help. When Mr. Goforth cannot leave the vehicle because of his disability, a passenger can form a negative opinion of him without knowing why. On information and belief, Lyft contracts with hospitals, and hospitals use Lyft in

place of ambulatory transport. Mr. Goforth has picked up patients released from hospital care who needed physical help getting in and out of the vehicle, although Lyft's policy, as he understands it, forbids drivers any physical contact with passengers. Lyft asks disabled drivers, disabled passengers and able-bodied drivers to do the same things, and its structure does not mirror the set-asides that federal disability law gives them. Mr. Goforth alleges that a company of Lyft's size and resources that disregards federal disability law in this way has engaged in outrageous conduct and neglect that warrants punitive damages.

**J. Arbitration Opt-Out**

70. Mr. Goforth sent a written opt-out notice to Lyft at arbitrationoptout@lyft.com on each of four dates: December 19, 2024; March 3, 2026; April 7, 2026; and October 7, 2026. *(Plaintiff's Exhibit 1, Page 18 of 20, opt-out notice no. 4)* Lyft's reply of October 21, 2026 states that "Lyft received all three opt-out notices." *[Counsel for Lyft, Sarah A. Belger, ECF 23 at 2, October 21, 2026]* The supplemental declaration filed with it mentions no opt-out notice. *[Lyft declarant, Senior Paralegal, Jeannie Lieu, ECF 23-1, October 21, 2026]* Neither mentions the October 7, 2026 notice, sent to the same address fourteen days earlier. Mr. Goforth has demanded a trial by jury.

**K. Summary of Damages**

71. As a direct and proximate result of Lyft's wrongful conduct as alleged here, Mr. Goforth has suffered and continues to suffer substantial damages including, without limitation: lost earnings and income during the 185-day wrongful deactivation; the loss of his housing and the destruction of his credit and rental history; costs of relocation and storage; past and future medical expenses including the cost of spinal surgery and lifetime care; future lost earning capacity as a result of his spinal condition; physical pain and suffering; emotional distress; loss of enjoyment of life; loss of dignity and humiliation; and other consequential and incidental damages, in amounts to be proven at trial. Mr. Goforth states these items of special damage,

including the loss of income, the loss of housing, relocation and storage costs, and medical expense, as Federal Rule of Civil Procedure 9(g) requires, and will state the amounts in his disclosures and at trial. The losses of RiderTainment LLC, the business built on the Rideshare DJ Mobile App and the RideShare Radio Network, belong to the LLC and are claimed by it in Count VII, not by Mr. Goforth individually.

71A. Mr. Goforth alleges that his damages followed from a chain of acts and omissions by the Lyft individuals and counsel named in this Complaint, and that the chain continues to this day. For the 185 days: Elizabeth, whose April 25, 2023 message acknowledged the hold without stating the alleged conduct or any step to cure *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*; Juan Luis, who displaced his attempts to cure and told him the deactivation would stay *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*; and Jeremy, who told him three times in one day that the decision "will remain final" *[Specialist from Lyft safety Department, Jeremy (the body of the email says "Jeremiah"), July 14, 2023, 9:25 AM, 2:40 PM and 3:31 PM Pacific]*. For the continuing chain: on October 21, 2026, Lyft told the Court that it "received all three opt-out notices" *[Counsel for Lyft, Sarah A. Belger, ECF 23 at 2, October 21, 2026]*, supported by a supplemental declaration that mentions no opt-out notice *[Lyft declarant, Senior Paralegal, Jeannie Lieu, ECF 23-1, October 21, 2026]*. Both left out the October 7, 2026 notice that Mr. Goforth had sent to Lyft's opt-out address fourteen days earlier, and he had to answer by surreply (ECF 24). Mr. Goforth alleges, on information and belief and in the alternative, that Ms. Lieu and Ms. Belger agreed on that omission, or that Ms. Belger filed without checking the communications she had received from him, a step a simple request before filing would have supplied. Either way, the omission suppressed a notice that goes to the arbitration question before the Court, and it added to the harm that began on April 25, 2023.

## COUNT I
## BREACH OF CONTRACT

72. Lyft permanently terminated Plaintiff without the notice and opportunity to cure that its own contract promises. Plaintiff incorporates by reference paragraphs 1 through 71A as if fully set forth herein. To prevail on a claim for breach of contract under Maryland law, a plaintiff must prove that the defendant owed him a contractual obligation and that the defendant breached that obligation. Taylor v. NationsBank, N.A., 365 Md. 166, 175 (2001). Lyft's Terms of Service, which Lyft filed in this case as ECF 20-4, are that contract, and Lyft swears that each time Plaintiff accepted them he "agreed to all of the terms and conditions contained in that Agreement" (ECF 20-3 at 4). Section 16 provides that a driver deactivated for any of four stated reasons, including a safety belief, "will be given notice of the potential or actual deactivation and an opportunity to attempt to cure the issue to Lyft's reasonable satisfaction prior to Lyft permanently terminating the Agreement," and that for any other breach "you will be provided notice and an opportunity to cure the breach" (ECF 20-4 at 25). The two sentences quoted in this paragraph appear in the same words in Section 16 of the Terms of Service in effect in April 2023.

72A. Lyft breached Section 16. It cut off Plaintiff's access after he had completed approximately 10,000 rides, and it did not tell him what was alleged for days. He answered in writing, wrote that this type of incident would never happen again, and Lyft never said whether that would satisfy it (paragraphs 25 to 26). Instead, Lyft wrote that his account "has been deactivated" and "will stay deactivated," and told him three times in one day that its decision "will remain final," referring only to "alleged violations." Plaintiff alleges that Lyft called the April 25, 2023 action a hold while acting on it as a deactivation already decided, so that the notice and opportunity to cure that Section 16 promises never operated for him. Each of the four earlier holds on his account had ended within about 28 hours through a process Lyft's staff described to him in writing (Plaintiff's Exhibit 1, Pages 7 to 10 of 20), and Lyft did not follow that process for him.

72B. The wrongful deactivation lasted 185 days. Lyft's breach of Section 16 caused Plaintiff damages, including the earnings he lost during those 185 days, in an amount to be proven at trial.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

73. Lyft used the deactivation discretion its contract gives it dishonestly and arbitrarily. Plaintiff incorporates by reference paragraphs 1 through 72B as if fully set forth herein. Under Maryland law every contract carries an implied duty of good faith and fair dealing, which "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." Blondell v. Littlepage, 413 Md. 96, 113 to 14 (2010) (citation omitted). Section 16 permits Lyft to deactivate a driver when it "has the good faith belief that such action is necessary to protect the safety of the Lyft community or third parties," and ties that discretion to notice and an opportunity to cure (ECF 20-4 at 25). The covenant required Lyft to use that discretion honestly and not arbitrarily, and not to prevent Plaintiff from performing as a Lyft driver and earning the income the agreement allows.

73A. Lyft did not do so. It acted on an alleged report by the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]*, who, a Lyft support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* later told Plaintiff, has a history of doing this to drivers (paragraphs 23A and 46A). It relied on an unidentified earlier report "regarding similar behavior," and it conducted no investigation (paragraph 26). It then answered his regular written appeals for 185 days with the statement that its decision was final, without telling him what it reviewed, who decided, or whether anyone looked into the passenger's report. Finally, it overturned its decision after "further reviewing the allegations and your entire history on the platform," on substantially the same record it had held final all that time *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]* (paragraphs 45 and 46). In the alternative, Plaintiff alleges that no genuine

report was made, or that Lyft used one to remove him for a purpose it has never disclosed (paragraph 23A). Under either allegation, Lyft did not exercise its discretion honestly.

73B. That arbitrary and bad-faith use of Lyft's discretion prevented Plaintiff from driving and deprived him of his income as a driver for 185 days. It caused him damages, including the earnings he lost during that period, in an amount to be proven at trial.

## COUNT III
## NEGLIGENCE

74. Lyft cut off Plaintiff's access to the platform and kept it cut off for 185 days without the investigation it had told him in writing was under way. Plaintiff incorporates by reference paragraphs 1 through 73B as if fully set forth herein. Under Maryland law, whether a tort duty exists depends on the nature of the harm likely to result from a failure to use due care and on the relationship between the parties. Where only economic loss is risked, the required "intimate nexus" between the parties "is satisfied by contractual privity or its equivalent," and where the risk is personal injury, "the principal determinant of duty becomes foreseeability." Jacques v. First National Bank of Maryland, 307 Md. 527, 534 to 35 (1986). Plaintiff and Lyft were in contractual privity under the Terms of Service (ECF 20-4), and the harm that followed from a failed review was both economic and physical. In addition, one who undertakes to render services to another which he should recognize as necessary for the protection of the other's person or things is liable for physical harm resulting from his failure to use reasonable care in the undertaking, if his failure increases the risk of the harm or the harm is suffered because of the other's reliance on the undertaking. Restatement (Second) of Torts § 323 (1965) (quoted in Fennell v. Southern Maryland Hospital Center, Inc., 320 Md. 776, 786 n.6 (1990)).

74A. When Lyft placed the hold, it wrote that "[a] specialist from our Trust and Safety team will be assigned to your case," who would "reach out by phone and email and keep you up to date," that "[m]ost cases can be responded to within the business day," and that "[i]f you have any information that you think may help the team regarding this decision, please feel free to

respond directly to this email" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*. It did not tell him what was alleged until May 3, 2023 (paragraph 25). Lyft knew he depended on the platform, because he told it in writing, "Lyft is my only income." Having undertaken the review, Lyft owed him reasonable care in conducting it, a duty that arises from Lyft's own statements and is separate from the notice-and-cure terms on which Count I rests.

74B. Plaintiff accepted Lyft's invitation. He answered in writing on April 26, 2023 and again on May 3, 2023, and he waited for the review he was told was under way (paragraphs 25 to 26). Plaintiff alleges that between Elizabeth's April 25 email and the May 6 notice that his account had been deactivated, no Lyft representative exchanged information with him about what was alleged, answered what he wrote, or told him what was being reviewed. Apart from Juan Luis's May 3 request that he again provide "any additional information," the only message that followed was the notice of deactivation. He waited a substantial time for a review that, he alleges, never took place, and the decision to deactivate him did not include his account of what happened.

74C. Plaintiff alleges that Lyft told him his account was on hold when it was not. Plaintiff alleges that a hold comes with steps, including notice and his right to cure (ECF 20-4 at 25), and that a deactivation is where those steps end. Nothing a review would produce followed April 25, 2023. Lyft instead closed the Hub and the local office to him and gave him directions on payout and on Lyft's name and trademarks (paragraph 26A), which is what follows a deactivation already decided. Plaintiff alleges that the April 25 "hold" was a deactivation from its start, and that Lyft called it a hold so that it could act on a deactivation without giving him the process a hold requires (paragraphs 22 to 26).

74D. Plaintiff alleges that the alleged incident was not the reason for the deactivation. Lyft used it to penalize him after the fact for earlier alleged reports on his account, none of which was ever confirmed. Each of the four earlier holds on his account ended with his reactivation within about 28 hours, after Lyft Support wrote that it had looked into the report. In one, Lyft

wrote that it "was unable to confirm that you knowingly violated Lyft's Terms of Service or Lyft's Service Animal policy" *[Lyft Support, Troy Alexander, November 7, 2021, 6:06 AM Pacific]*. In another, Lyft wrote that "it appears your account deactivation was processed in error" *[Lyft, position not stated in the email, Quinto, August 9, 2022, 10:36 AM Pacific]*. On May 6, 2023, Juan Luis named those earlier reports, not the alleged incident, as his reason: "Due to this not being the first time we receive a report regarding similar behavior on your account" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. The alleged report by the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]*, who, a Lyft support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* later told Plaintiff, has a history of doing this to drivers (paragraphs 23A and 46A), stayed an allegation throughout. Plaintiff alleges that Lyft treated reports it had itself settled in his favor as grounds for ending his account.

74E. Lyft breached its duty. It undertook a review and did not conduct one. It did not take up his account, did not tell him what was alleged until May 3, and did not respond within the business day in which Lyft had said most cases are answered. It acted without considering his "entire history on the platform," which Lyft's own reviewer did consider when it overturned the decision *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*.

74F. As a direct and proximate result, Plaintiff lost his income, fell behind on rent, lost his housing, could not obtain new housing because of the damage to his credit and rental history, and slept in his vehicle for approximately four months. He alleges that these conditions caused, or substantially aggravated, the multilevel lumbar spinal stenosis and left-sided radiculopathy shown on imaging, for which his treating orthopedic surgeon has planned a three-level lumbar fusion, and that Lyft's later reactivation of his account did not undo that harm. Losing the income a person lives on, and then his housing, were foreseeable consequences of acting on a report without investigating it, and the physical harm of months in a vehicle was a foreseeable consequence of losing his housing. He seeks compensatory damages for his lost income, housing

losses, lost earning capacity and future care caused by his spinal condition, and his emotional distress, in an amount to be proven at trial.

**COUNT IV**
**NEGLIGENT SUPERVISION AND RETENTION**

75. Lyft failed to supervise the Trust and Safety team and the support representatives who handled the report against Plaintiff, and it kept in place a practice that held his account closed for 185 days. Plaintiff incorporates by reference paragraphs 1 through 74F as if fully set forth herein. Under Maryland law, an employer who deals with the public must use reasonable care in selecting and retaining the people who act for it, and it answers for "his own negligence in not discharging his own duty," not for the mere act of the employee; the critical standard is whether the employer "knew or should have known" of the risk the employee presented. Evans v. Morsell, 284 Md. 160, 165 to 66 (1978) (first quotation quoting Norfolk and Western Railroad Co. v. Hoover, 79 Md. 253, 262 (1894)). Upon information and belief, the Lyft representatives who handled the report, including Elizabeth *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*, Juan Luis *[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]* and Jeremy *[Specialist from Lyft safety Department, Jeremy (the body of the email says "Jeremiah"), July 14, 2023, 9:25 AM, 2:40 PM and 3:31 PM Pacific]* ("Lyft's reviewers"), were Lyft's employees or agents acting within the scope of that employment or agency.

75A. Lyft undertook to review driver reports before acting on them. Its Terms provide that a driver is to "be given notice of the potential or actual deactivation and an opportunity to attempt to cure the issue to Lyft's reasonable satisfaction prior to Lyft permanently terminating the Agreement" (ECF 20-4 at 25), and its staff told him in writing on April 25, 2023 that a specialist from its Trust and Safety team would be assigned to his case (paragraph 74A). Having undertaken that review, and knowing a driver's income depends on it, Lyft owed Plaintiff a duty

of reasonable care to see that its reviewers carried it out, a duty that arises from what Lyft undertook and exists apart from the Terms (paragraph 74).

75B. Lyft knew, or in the exercise of reasonable care should have known, that its reviewers needed supervision when they acted on a report against a driver. In February 2023, two months before the hold, the Asian Law Caucus and Rideshare Drivers United published "Fired by an App," a survey of 810 Uber and Lyft drivers in California. It reported that, among deactivated drivers who were given a reason, 42 percent were told the cause was a customer complaint (*Fired by an App* at 19), and a Lyft representative *[Lyft representative, name not stated, quoted by NBC News, 2023]* publicly answered that the report was "flawed to its core." Lyft had also handled reports on his account four times before, and each hold had ended with his reactivation within about 28 hours, one because Lyft "was unable to confirm" a knowing violation and another because the deactivation "was processed in error" (paragraph 74D). Lyft's own support specialist later told Plaintiff, in confidence, that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* has a history of doing this to drivers *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* (paragraph 46A). Plaintiff does not know when Lyft first learned that history. Upon information and belief, it was in Lyft's records when its reviewers acted on April 25 and May 6, 2023, or, in the alternative, those reviewers acted without checking Lyft's own records of reports by that passenger. Upon information and belief, Lyft's complaint process also gives riders a refund or ride credits, which Lyft knew gave a rider a reason to complain (paragraph 23A).

75C. Lyft did not supervise its reviewers. They placed the hold with no notice of what was alleged, did not say what the report alleged until May 3, 2023, and made the deactivation permanent on May 6, 2023 without saying what they made of his written account or whether his assurance that it would never happen again would satisfy Lyft (paragraphs 25 to 26). Lyft then told him three times in one day that its decision "will remain final," and later overturned it on substantially the same record: "After further reviewing the allegations and your entire history on

the platform, we have decided to overturn this decision and reactivate your account" *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*. In April and May 2023 the first-tier representative who received a complaint against a driver could also deactivate the driver, with no second review. Plaintiff knows this because Lyft's support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* told him, on or within a day after the October 27, 2023 reactivation, that Lyft had since changed its practice: the first-tier representative who receives a complaint no longer has authority to deactivate, that representative gathers the information and passes it to a higher-tier group, and no driver is deactivated unless that group clears it (paragraph 46A). Upon information and belief, Lyft also had no step requiring a supervisor to confirm notice and an opportunity to cure before a termination became permanent, none bringing a hold to a supervisor when it ran past the roughly 28 hours in which its own earlier holds on his account had ended, and none reviewing what its support representatives told him. In the alternative, if Lyft's own policy allowed what its reviewers did, that policy was the failure to supervise. Had Lyft supervised its reviewers, the deactivation would have ended in days, as the four earlier holds did.

75D. As a direct and proximate result, Plaintiff lost his income, his housing and his credit, slept in his vehicle for approximately four months, and suffered a spinal injury that those conditions caused, or substantially aggravated, harms foreseeable to Lyft because he had told it in writing, "Lyft is my only income." Plaintiff suffered damages in an amount to be proven at trial. This Count concerns Lyft's supervision of its reviewers, not the passenger's conduct or reasons.

**COUNT V**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

76. Lyft's negligence caused Plaintiff severe emotional distress that resulted in physical injury. Plaintiff incorporates by reference paragraphs 1 through 75D as if fully set forth herein. Under Maryland law, a plaintiff may recover damages for emotional distress caused by a

defendant's negligence when the distress results in a physical injury, and "physical" does not carry its dictionary sense: it "is used to represent that the injury for which recovery is sought is capable of objective determination." Vance v. Vance, 286 Md. 490, 500 (1979). The injuries that qualify include depression, inability to work, loss of appetite, insomnia, nightmares, and extreme nervousness. Hoffman v. Stamper, 385 Md. 1, 34 to 35 (2005) (describing Vance, 286 Md. at 500 to 01). Lyft owed Plaintiff a duty of reasonable care in reviewing the report against him, for the reasons stated in paragraphs 74 and 74A, and breached it as stated in paragraphs 74B through 74E and 75C.

76A. From April 25, 2023, Plaintiff waited for a review that, he alleges, never took place (paragraph 74B). Lyft told him his account was on hold when it was not (paragraph 74C), and then told him its decision "will remain final." He had told Lyft in writing, "Lyft is my only income," so the distress that followed was a foreseeable result of a failed review. He lost his income, fell behind on rent, and lost his housing for the first time in his life. For approximately four months he slept in his vehicle in short stretches, sitting partly upright, in the cold, on constant watch for strangers and for being told to move on. He fell into hopelessness and depression, and he began drinking alcohol every day while facing financial ruin and eviction. His distress also included anxiety and a profound loss of dignity.

76B. Plaintiff's distress resulted in physical injury that is capable of objective determination. A psychiatrist has diagnosed him with major depressive disorder, and his primary care physician, who has postgraduate training in psychiatry, is treating him for post-traumatic stress disorder; both have documented the diagnoses in his medical records. In addition, he alleges that the conditions Lyft's negligence set in motion, the loss of his income, the loss of his housing, and the nights in his vehicle, caused or substantially aggravated the multilevel lumbar spinal stenosis and left-sided radiculopathy shown on imaging, for which his treating orthopedic surgeon has planned a three-level lumbar fusion, and that his distress was compounded by that injury.

76C. Plaintiff alleges that the distress and the physical injury were the foreseeable result of Lyft's failure to conduct the review it undertook, and that Lyft's reactivation of his account on October 27, 2023 did not undo them. As a direct and proximate result, he has suffered damages, including emotional distress, physical injury, and the cost of treating that injury, in an amount to be proven at trial.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, WITH DEMAND FOR PUNITIVE DAMAGES

77. Lyft's conduct toward Plaintiff was intentional or reckless, it was extreme and outrageous, and it caused him severe emotional distress. Plaintiff incorporates by reference paragraphs 1 through 76C as if fully set forth herein. Under Maryland law, four elements "must coalesce" to impose liability for intentional infliction of emotional distress: the conduct must be intentional or reckless, it must be extreme and outrageous, it must be causally connected to the emotional distress, and the distress must be severe. Harris v. Jones, 281 Md. 560, 566 to 67 (1977). Conduct is reckless where the defendant "acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." Id. at 567.

77A. Lyft held the power over Plaintiff's income, and it knew it. On May 3, 2023, Plaintiff wrote to Lyft, "Lyft is my only income." Three days later Lyft wrote that his account "has been deactivated" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. Maryland courts scrutinize carefully the conduct of a defendant who is "in a peculiar position to harass the plaintiff, and cause emotional distress," including a defendant who abuses a position that gives it "power to affect his interests." Harris, 281 Md. at 569.

77B. Plaintiff had completed more than 10,000 rides with a 5.0 rating. Plaintiff alleges that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* began a conversation and directed it at him, and that his answers were positive remarks. Upon information and belief, the passenger told Lyft only that her feelings were hurt, and the report described no act by Plaintiff and no safety concern (paragraphs 22

through 26). Lyft wrote on April 25, 2023 that a specialist from its Trust and Safety team would "reach out by phone and email and keep you up to date" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*, and in the same message Elizabeth wrote, "I'll reach out with more details soon." Plaintiff alleges that he received no further message from her. Eight days later a different writer began, "I apologize for the late response" *[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]*, and Plaintiff alleges that this writer took over the case in the middle of the process Elizabeth had described and ended it by deactivating him three days later. From April 25, 2023 until October 27, 2023, Lyft did not telephone him and wrote to him only by email (paragraph 39). Plaintiff alleges that the "hold" was a deactivation from its start, that no review took place (paragraphs 74B and 74C), and that Lyft did not give him the notice and opportunity to cure that its own Terms promise (ECF 20-4 at 25).

77C. Lyft then told Plaintiff, in writing, that nothing he did would change the outcome. On May 6, 2023, Lyft wrote that "your account will stay deactivated and you won't be able to re-apply with a new account," that the writer would be "the direct point of contact who reviewed the details associated with your deactivation," and that "[o]utreach to other members of the Safety team will not reverse this decision" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. On July 14, 2023, a different Lyft specialist wrote that "[t]he decision to deactivate your account has been reviewed and will remain final," and wrote twice more that day that it "will remain final" *[Specialist from Lyft safety Department, Jeremy (the body of the email says "Jeremiah"), July 14, 2023, 9:25 AM, 2:40 PM and 3:31 PM Pacific]*. Plaintiff wrote to Lyft on April 26, May 3 and May 5, again on July 14, and again on October 26, 2023 (Plaintiff's Exhibit 1, pages 3 to 6 and 11 to 16).

77D. Plaintiff alleges that those statements were false when made and that Lyft knew it. Each of the four earlier holds on his account ended within about 28 hours, and in one Lyft wrote that "it appears your account deactivation was processed in error" *[Lyft, position not stated in the email, Quinto, August 9, 2022, 10:36 AM Pacific]*. On October 26, 2023, Lyft wrote that it had

"passed these concerns along to the team that can assist you further" *[Lyft Support, Celidey, October 26, 2023, 1:02 AM Pacific]*, and on October 27, 2023, Lyft's Trust and Safety team overturned this decision: "After further reviewing the allegations and your entire history on the platform, we have decided to overturn this decision and reactivate your account" *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*. It did so on substantially the same record (paragraph 46). Plaintiff alleges that Lyft knew its Safety team could reverse the decision, because it had done so before, and that Lyft told him otherwise to make him believe that nothing he did would change the outcome, so that he would stop trying to be heard.

77E. The May 6, 2023 message told Plaintiff where every later effort would lead before he had made one. Lyft wrote that its writer would be "the direct point of contact who reviewed the details associated with your deactivation," and that "[i]f you have any questions, please direct them to me." It wrote that "outreach to other members of the Safety team will not reverse this decision," and that team members at the Hub or Local office "will not be able to escalate, expedite, or provide information on your behalf." It wrote that he "won't be able to re-apply with a new account." Lyft did not forbid Plaintiff from seeking review elsewhere. It told him that doing so was pointless. Plaintiff alleges, on information and belief, that the writer could say what other members of the Safety team would do because they had been told, or had agreed, how they would act, and that Lyft's Safety personnel were to answer any later effort by Plaintiff with the same decision, so that no later effort would reach a reviewer who would reconsider it. The July 14, 2023 answers did what the May 6 message said they would: a different specialist repeated the decision three times in one day, named no fact, and did not address anything Plaintiff had written (paragraph 77C). The May 6 message itself thanked Plaintiff "for following up" and said its writer had "reviewed the details," but it did not quote, mention or answer anything he had written on April 26 or May 3 (paragraph 44).

77F. Plaintiff alleges that the purpose of the May 6 message, and of the answers that followed it, was to keep him from the notice and opportunity to cure that Section 16 of the Terms promises (ECF 20-4 at 25), and from every other means of putting his account before someone

who would reconsider it, and that Lyft knew the effect would be to keep him off the only income he had told it he had. The message worked as intended for periods. Plaintiff stopped writing because it told him that writing was pointless, and he waited until he believed the writer's attention had moved from his case. He did not believe the decision was right. He wrote again, and on October 27, 2023, the decision was overturned.

77G. That is actual malice, by either route Maryland recognizes. First, "the defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages." Ellerin v. Fairfax Savings, F.S.B., 337 Md. 216, 234 (1995). Lyft told Plaintiff that review by its Safety team would not change the decision, knowing that its Safety team could and did reverse such decisions, so that he would not ask. Second, actual malice is "consciousness of the wrongdoing" or "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud." Darcars Motors of Silver Spring, Inc. v. Borzym, 379 Md. 249, 266 (2004) (quoting Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 460 (1992)). Lyft knew that Plaintiff had no other income and that its own Terms promised notice and an opportunity to cure, and Plaintiff alleges that it set out in advance to block both. Plaintiff has stated the speaker, the words and the date of each statement, and he alleges Lyft's knowledge and intent generally. Fed. R. Civ. P. 9(b). Plaintiff alleges, in the alternative and on information and belief, that Lyft removed him either to stop a product that could strengthen a competitor's market share, or out of other malice, including a perceived threat of exposure from what drivers and hosts said on his Network. Plaintiff also pleads, in the alternative, that no genuine report was made, or that Lyft used one to remove him for a purpose it has never disclosed (paragraph 23A).

77H. Lyft's conduct caused Plaintiff severe emotional distress. The Maryland element requires "a severely disabling emotional response to the defendant's conduct." Harris, 281 Md. at 570. Plaintiff waited for a review that never took place, was told that his account was on hold when it was not, and was then told that the decision "will remain final" (paragraph 76A). He lost his income, fell behind on rent, and lost his housing for the first time in his life. For

approximately four months he slept in his vehicle in short stretches, sitting partly upright, in the cold. The statements told him that nothing he wrote to Lyft would change the decision. He fell into hopelessness and depression, and he began drinking alcohol every day while facing financial ruin and eviction. A psychiatrist has diagnosed him with major depressive disorder, his primary care physician, who has postgraduate training in psychiatry, is treating him for post-traumatic stress disorder, both have documented his distress in his medical records, and he remains in treatment. After the reactivation, Plaintiff feared that the writer, on learning of it, would make another attempt to have his account deactivated on a false report. The wrongful deactivation also caused or substantially aggravated the spinal condition alleged in paragraph 76B.

77I. Plaintiff seeks compensatory damages in an amount to be proven at trial, and punitive damages in an amount the jury finds sufficient to punish Lyft and to deter Lyft and others from the same conduct. He does not seek punishment of Lyft for harm to people who are not parties to this action.

77J. Count VII concerns RiderTainment LLC, a separate entity that Plaintiff may not represent under Local Rule 101.1.a, and Plaintiff asks the Court to sever it under Fed. R. Civ. P. 21. This Count rests on its own facts and stands whether or not Count VII is severed.

## COUNT VII

## BUSINESS DESTRUCTION: TORTIOUS INTERFERENCE WITH RIDERTAINMENT LLC

## LOCAL RULE 101.1.a: A COUNT OF A SEPARATE ENTITY, TO BE SEVERED

78. This Count is the claim of RiderTainment LLC, a Florida limited liability company (Plaintiff's Exhibit 3), and not a claim of Controlling Member Steven A. Goforth. Under Local Rule 101.1.a, an individual may represent himself in a civil case, but a party that is not an individual, such as a limited liability company, may appear only through counsel. See Rowland v. California Men's Colony, 506 U.S. 194, 201 to 02 (1993) (a corporation "may appear in the federal courts only through licensed counsel," and "the rationale for that rule applies equally to all artificial entities"). Controlling Member Steven A. Goforth does not represent RiderTainment

LLC and signs nothing on its behalf. He appears in this Count as a witness, including on damages. RiderTainment LLC will appear through counsel.

78A. This Count has its own subject and its own proof, apart from Counts I through VI and Count VIII: the business, the app, the Network and the company's records, as against the deactivation, the Terms and the injuries to Plaintiff Steven Anthony Goforth. Plaintiff Steven Anthony Goforth, who asserts Counts I through VI and Count VIII, asks the Court to sever this Count under Fed. R. Civ. P. 21 into its own action, to be related to this one under Local Rule 103.1.b. He does not ask the Court to dismiss it. RiderTainment LLC reserves the right to appear, through counsel, in this action or in the severed action. This Count restates the facts it relies on so that it stands on its own.

78B. On severance, Plaintiff Steven Anthony Goforth asks that the Clerk assign this Count its own civil action number. RiderTainment LLC appears only through counsel, and it will address the filing fee for the severed action through its counsel. The relief requested on severance, including the assignment of case numbers and the fee request for the severed action in which Plaintiff Steven Anthony Goforth is the plaintiff, is stated in the Prayer for Relief.

79. RiderTainment LLC is a media and technology company. Controlling Member Steven A. Goforth is its sole member (Plaintiff's Exhibit 3). He built its products while driving for Lyft, funded only by his Lyft earnings, without hiring anyone, and he spent his remaining hours, seven days a week, on the work. Under the internal agreement between RiderTainment LLC and its Controlling Member, the advances he made to the company were given in exchange for equity in the company, to be issued when available.

79A. The Rideshare DJ mobile app is the driver's version of the company's product and runs on the driver's phone. It encourages passengers to tip their driver and gives passengers safety and privacy reminders. The RideShare Radio Network is the company's audio network. It ran eleven original shows around the clock, one hosted by Controlling Member Steven A. Goforth under a pseudonym and the others hosted by AI hosts that he built and administered. The company marketed the app publicly in the video "Get 3 Days Free Premium Stream"

(https://www.youtube.com/watch?v=VzzxObl0D0s; Exhibit Index, Tab 2; Plaintiff's Exhibit 2, Part 1, pages 1 to 2 of 7), and it documented the product in the video "RideShare Dj Mobile App Users Guide (FULL VERSION)" (https://www.youtube.com/watch?v=BvtoT7IadRU; Exhibit Index, Tab 2; Plaintiff's Exhibit 2, Part 2, pages 3 to 7 of 7). Its public website, https://ridesharedj.com, is no longer in service. The product had four sources of revenue: Google advertising on a free version, a premium stream, RIDERtisement advertising on the Network, and Passenger Mall.

79B. Before April 25, 2023, the company tested the product live in Lyft rides, in the vehicle that Controlling Member Steven A. Goforth used for both Lyft and the company, which was registered in the Lyft app and approved by Lyft. In that short testing period he saw higher and more frequent tips. Passengers who heard the Network in the vehicle, before any of them knew who had created it, said without prompting that it was a great idea, asked how to learn more, and said, "whoever created this is going to make millions." Riders credited Lyft for the Network.

79C. RiderTainment LLC alleges, on information and belief, that Lyft knew of the company and the Network, or had regular opportunities to learn of them. From the testing period through the launch, every time Controlling Member Steven A. Goforth drove, seven days a week for the hours he was online, the Network played in a vehicle on the Lyft platform. Lyft's Terms provide for the collection of ride data and for in-ride recording (ECF 20-4 at 45 to 46). RiderTainment LLC does not allege that Lyft captured the Network; whether it did is a matter for discovery. RiderTainment LLC also alleges, on information and belief, that Uber and Lyft rank first and second in App Store and Google Play search results for rideshare, and that the Rideshare DJ app sometimes appeared beside them with its logo, name and description.

80. On April 25, 2023, Lyft removed Controlling Member Steven A. Goforth's access to the Lyft platform and told him that his account was on a "hold" *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*. RiderTainment LLC alleges that the "hold" was a deactivation from its start. On May 6, 2023, Lyft wrote that "your account will stay

deactivated and you won't be able to re-apply with a new account," and that "[o]utreach to other members of the Safety team will not reverse this decision" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. On October 27, 2023, after 185 days, Lyft's Trust and Safety team reversed the decision: "After further reviewing the allegations and your entire history on the platform, we have decided to overturn this decision and reactivate your account" *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*. RiderTainment LLC alleges, on the account of its Controlling Member, that Lyft reversed the decision on substantially the same record on which it made it.

80A. For 185 days, Lyft's wrongful deactivation cut the company off from the rides in which its product was tested, demonstrated and sold, and from the riders who were its audience. It ended the live testing on which the business depended.

80B. Maryland recognizes tortious interference with a business's economic relations, which is committed when a defendant's intentional interference with another's business "maliciously or wrongfully infringes upon an economic relationship." Macklin v. Robert Logan Associates, 334 Md. 287, 297 (1994). The plaintiff must prove "both a tortious intent and improper or wrongful conduct." Id. at 301. Tortious intent may be shown by the defendant's intent "to harm the plaintiff or to benefit the defendant at the expense of the plaintiff." Id. The interference must be "conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc., 336 Md. 635, 657 (1994). RiderTainment LLC pleads each of these.

80C. Tortious intent. RiderTainment LLC alleges, on information and belief and in the alternative, that Lyft removed Controlling Member Steven A. Goforth's access to stop a product that could strengthen a competitor's market share, or out of other malice, including a perceived threat of exposure. The app included a function that let drivers share with each other and with passengers incidents of threats, intimidation and scams (the Ride SCARE S.H.O.U.T. function, pronounced "Ride Scare Shout"), and the Network's hosts spoke to different groups within the passenger audience. His position as a Lyft driver gave him his understanding of how Lyft works

and his reach to its drivers and passengers. RiderTainment LLC alleges that the removal pre-empted that access.

80D. Wrongful conduct. Wrongful acts include "injurious falsehood or other fraud." Alexander, 336 Md. at 657 (quoting K & K Management, Inc. v. Lee, 316 Md. 137, 166 (1989)). Actual malice, "in the sense of ill will, hatred or spite," also makes interference wrongful "where the defendant's malice is the primary factor that motivates the interference." Id. RiderTainment LLC does not rest this Count on a breach of the Terms alone. See id. at 654. It alleges that Lyft told Controlling Member Steven A. Goforth that his account was on a "hold" when it was a deactivation, and then told him that review by its Safety team would not change the decision, when Lyft knew that its Safety team could reverse such a decision. Each of the four earlier holds on his account ended within about 28 hours, and Lyft reversed this decision on October 27, 2023. RiderTainment LLC alleges that Lyft made those statements to keep the decision in place, so that the company would stay cut off from the rides and the riders on which it depended.

80E. In the alternative, RiderTainment LLC alleges that no genuine report was made, or that Lyft used one to remove Controlling Member Steven A. Goforth for a purpose it has never disclosed. A Lyft support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* told him, in confidence and in substance, that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* has a history of doing this to drivers. RiderTainment LLC alleges, on information and belief, that the history includes using Lyft's complaint process to obtain free ride credits.

81. RiderTainment LLC alleges that Lyft's tortious interference destroyed the business. The wrongful deactivation ended the live testing on which the company depended. It cost Controlling Member Steven A. Goforth his income and his housing for the first time in his life, and it caused, or substantially aggravated, the spinal condition alleged in Counts I through VI, which left the person who built and ran the company unable to continue it. Lyft's tortious interference is the direct cause of the losses stated below.

81A. Under Fed. R. Civ. P. 9(g), RiderTainment LLC specifically states these items of special damage, each lost because Lyft's tortious interference destroyed the business: Google advertising revenue from the free version; premium subscription revenue; RIDERtisement advertising revenue; Passenger Mall sales; the subscription growth that an affiliate program, built and in testing, was designed to produce; the funds and labor invested in the app and the Network; the ability to test, demonstrate and sell the product in rides; the goodwill and the value of the company's marks, logos, software, content and domain names as a going business; the opportunity to bring the Network and APDJ to the driverless rideshare market from its early stages; the value of RiderTainment LLC, including its planned APDJ product; and further items that discovery and expert analysis permit it to identify. RiderTainment LLC will prove the amount of each item at trial, with expert testimony as appropriate.

81B. APDJ, the Autonomous Personal DJ, is the partnered driverless version of the product. Equipment in the vehicle recognizes the rider as the user and bridges the rider's own music, and an embedded AI host greets and talks with the rider, with a per-ride subscriber tier and advertising at intervals (Plaintiff's Exhibit 3, Page 10 of 10). The company built toward APDJ with Lyft as its intended partner, and RiderTainment LLC alleges that APDJ would have given Lyft an edge that no other driverless provider has. During the deactivation, driverless rideshare was taking shape, and RiderTainment LLC alleges that Uber and Lyft were moving toward partnerships with Waymo. The company's business plan contains projections (Plaintiff's Exhibit 3, Pages 9 to 10 of 10). They are projections of a business plan. They are not revenue realized, a valuation or an amount of damages, and they record no sale or offering that occurred.

81C. RiderTainment LLC seeks compensatory damages from Lyft for its tortious interference with, and the destruction of, the business, in an amount to be proven at trial. The matter in controversy on this Count "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a).

## COUNT VIII

## DISCRIMINATION BY LYFT: RACE (8a), DISABILITY (8b), AND DENIAL OF NOTICE AND APP DATA (8c)

82. This Count is asserted by Plaintiff Steven Anthony Goforth, who appears for himself. It has its own subject and its own proof, apart from Counts I through VII: how Lyft treated Plaintiff because of his race and his disability, and the notice and app data it withheld from him. Plaintiff asks the Court to sever it under Fed. R. Civ. P. 21 into its own action, with its own civil action number, related to this action under Local Rule 103.1.b. He does not ask the Court to dismiss it. This Count restates the facts it relies on so that it stands on its own.

82A. Plaintiff is intent on filing a complaint with the Maryland Commission on Civil Rights about the facts in this Count. Plaintiff asserts his claims under Md. Code, State Gov't § 20-304 now, so that they are not lost, and asks that, if the Court finds that the conditions of Md. Code, State Gov't § 20-1013(a)(1) have not yet been met, it hold those claims until they are met and not dismiss them. Plaintiff alleges that his claims under 42 U.S.C. § 1981 and 42 U.S.C. § 12184(a) do not require an administrative complaint.

### 8a. RACE

83. Lyft's Terms of Service (ECF 20-4) are one agreement that binds drivers and riders alike as Users. Plaintiff is a Black man. He drove for Lyft under the Terms, with a 5.0 rating across more than 10,000 rides. Lyft held his driver's license and background check, and his profile photograph was visible to riders.

83A. A passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* alleged that Plaintiff made discriminatory comments about the LGBTQ+ community during a ride. Plaintiff alleges that the passenger began the conversation and directed it at him, and that his answers were positive remarks: he hoped the LGBTQ+ community would gain the political power to win a White House election, he supported it, and he wished it the best result. Lyft later described the alleged report as "making discriminatory comments about the LGBTQ+ community during a ride, making a passenger feel uncomfortable and discriminated"

*[Lyft Support, position not stated in the email, Juan Luis, May 3, 2023, 12:23 PM Pacific]*. Plaintiff denies it. No Lyft message says that he endangered anyone.

83B. On April 25, 2023, Lyft removed Plaintiff's access and told him that his account was on a "hold," without telling him what was alleged *[Lyft Support, position not stated in the email, Elizabeth, April 25, 2023, 5:40 PM Pacific]*. Plaintiff alleges that the "hold" was a deactivation from its start. Lyft never acknowledged, responded to or answered what he wrote on April 26 and May 3, 2023. On May 6, 2023, Lyft wrote that "your account will stay deactivated and you won't be able to re-apply with a new account," and that "[o]utreach to other members of the Safety team will not reverse this decision," giving as its reason "this not being the first time we receive a report regarding similar behavior on your account" *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*. On July 14, 2023, a different Lyft specialist wrote three times in one day that the decision "will remain final" *[Specialist from Lyft safety Department, Jeremy (the body of the email says "Jeremiah"), July 14, 2023, 9:25 AM, 2:40 PM and 3:31 PM Pacific]*. The Terms promise a driver notice and an opportunity to cure before Lyft permanently terminates the agreement (Section 16, ECF 20-4 at 25). Plaintiff received neither.

83C. Plaintiff alleges, on information and belief, that the same Lyft department, its Safety team, received the passenger's report, took her account, and acted on it under the same Terms. It gave her full service under the Terms, and it denied the same service to Plaintiff. The two Users were in one transaction, under one agreement, handled by one department. She is white, and he is Black.

83D. On October 27, 2023, or within a day after, a Lyft support specialist *[Lyft support specialist, name not recalled, telephone call, on or within one day after October 27, 2023]* telephoned Plaintiff and told him, in confidence and in substance, that the passenger *[Lyft rider app user/Passenger, low to mid-20s, white or Caucasian, presenting as female]* has a history of doing this to drivers. The specialist also told him, in substance, that Lyft had since changed how it reviews complaints: the first-tier representative who hears a complaint no longer has authority

to deactivate a driver, and a higher-tier group must clear every deactivation. The specialist offered this as assurance that it would not happen again, because Lyft's chief executive and management had made corrective changes.

83E. On October 27, 2023, after 185 days, Lyft's Trust and Safety team reversed the decision: "After further reviewing the allegations and your entire history on the platform, we have decided to overturn this decision and reactivate your account" *[Lyft Trust & Safety team, Jonas, October 27, 2023, 1:03 PM Pacific]*. Plaintiff alleges that Lyft reversed the decision on substantially the same record on which it made it. The only addition he knows of was his own account, which repeated the denial he had put in writing on May 3, 2023.

83F. Plaintiff alleges that the alleged report was absent of any proven fact that could hold up under investigative scrutiny, and that this is why Lyft sought out historical context to attach the deactivation to: the earlier reports against him, which Lyft relied on in May 2023 *[Lyft Support, position not stated in the email, Juan Luis, May 6, 2023, 10:10 AM Pacific]*, were never confirmed and each ended with his account restored. Plaintiff alleges that, with no proven fact left to support the decision, it rested on a preference, that the preference was race, and that this shows the deactivation was an act of discrimination and not a decision made on Lyft's Terms of Service or its community guidelines. Each of the four earlier holds on his account ended within about 28 hours, and in one Lyft wrote that "it appears your account deactivation was processed in error" *[Lyft, position not stated in the email, Quinto, August 9, 2022, 10:36 AM Pacific]*.

83G. A February 2023 report by the Asian Law Caucus and Rideshare Drivers United, "Fired by an App," surveyed 810 current and former Uber and Lyft drivers in California. It found that 69% of drivers of color had experienced some form of deactivation, compared with 57% of drivers who identify as white (at 3 to 4), and that half of the drivers surveyed had experienced bias or discrimination because of their race or national origin. Plaintiff cites the report as context and as notice to Lyft before April 25, 2023, and not as proof about his ride.

83H. Lyft answered that report in public. NBC News reported in 2023 that a Lyft representative called the report "flawed to its core with a predetermined conclusion not grounded

in facts," said, "We strongly condemn discrimination of any kind and are committed to preventing it on our platform," and said that Lyft "takes safety reports from riders and drivers seriously and reviews and investigates them" *[Lyft representative, name not stated, quoted by NBC News, 2023]*. Plaintiff cites the statement because Lyft chose to make it in public. It shows that Lyft knew of the report and its findings, and it states how Lyft says it handles a safety report: it reviews and investigates it. Plaintiff alleges that Lyft did neither before it removed his access (paragraphs 83B and 83C).

83I. The Fourth Circuit states the test for a claim under 42 U.S.C. § 1981 this way: "a plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest," and the plaintiff must also show that the interference "would not have happened but for the plaintiff's race." To survive a motion to dismiss, "a plaintiff must allege facts that, if accepted as true, allow the court to draw a reasonable inference as to those legal requirements." Nadendla v. WakeMed, 24 F.4th 299, 305 (4th Cir. 2022) (quoting Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006), and citing Comcast Corp. v. National Ass'n of African American-Owned Media, 140 S. Ct. 1009, 1019 (2020)). The statute reaches "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," and protects against impairment by private parties. 42 U.S.C. § 1981(b), (c). Plaintiff pleads the contract (the Terms), his race, the other User's race, how each was treated, and the call described in paragraph 83D, and he alleges that Lyft would not have treated him as it did but for his race.

83J. Plaintiff seeks compensatory damages for Lyft's discrimination in an amount to be proven at trial, and punitive damages in an amount the jury finds sufficient to punish Lyft and to deter Lyft and others from the same conduct.

**8b. DISABILITY**

84. Plaintiff now drives with a disability. His driver profile used to carry his own statement of his disability, and Lyft removed it. Lyft's platform gives a driver no supported way to let passengers know that he has a disability. Passengers commonly expect a driver to get out on arrival and help with luggage, groceries and other belongings, and a driver who cannot do so because of a disability can be rated low or reported as unhelpful or aggressive without the passenger knowing why. Plaintiff's rating, which had been 5.0, has fallen below 5.0, and Lyft has given no reason. The Terms treat a driver's falling below a star rating threshold as a ground for deactivation (ECF 20-4 at 25). Plaintiff alleges, on information and belief, that Lyft has made no accommodation for its disabled drivers.

84A. On August 2, 2025, Lyft Support answered Plaintiff's request about cancelling assisted rides that require him to lift heavy items. The reply said that "we are unable to make any exclusions to your acceptance rate" and acknowledged "a missing feature to help disabled drivers service a ride request more smoothly" *[Lyft Support, Maria, August 2, 2025, 8:51 AM Pacific]*. The email states no referral of his request to the department that handles accessibility and disability, and no follow-up (Plaintiff's Exhibit 1, Page 19 of 20).

84B. Plaintiff alleges that this conduct violates Title III of the Americans with Disabilities Act, 42 U.S.C. § 12184(a), which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." One court has found it plausible that a ride-share company is such an entity. Equal Rights Center v. Uber Technologies, Inc., No. 17-cv-1272 (KBJ), slip op. at 33 to 38 (D.D.C. Mar. 15, 2021). The remedies and procedures of 42 U.S.C. § 2000a-3(a) apply to a person subjected to discrimination in violation of that subchapter. 42 U.S.C. § 12188(a)(1). Plaintiff seeks an order requiring Lyft to modify its policies

and to provide drivers with disabilities a way to decline assisted rides and to let passengers know of the disability, as the preventive relief that 42 U.S.C. § 2000a-3(a) permits.

84C. Disability is also a protected ground under Md. Code, State Gov't § 20-304, which provides that an owner or operator of a place of public accommodation, or its agent or employee, "may not refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges of the place of public accommodation because of the person's ... disability." Plaintiff alleges that Lyft is a private entity that offers services and transportation (Md. Code, State Gov't § 20-301(4)). Lyft gives passengers no notice that a driver has a disability, and when Plaintiff cannot leave the vehicle because of his disability, a passenger can form a negative opinion of him without knowing why. Lyft asks disabled drivers, disabled passengers and able-bodied drivers to do the same things, and its structure does not mirror the set-asides that federal disability law gives them. Plaintiff alleges that a company of Lyft's size and resources that disregards federal disability law in this way has engaged in outrageous conduct and neglect that warrants punitive damages.

84D. Plaintiff seeks the injunctive relief stated in paragraph 84B and, under Md. Code, State Gov't § 20-304 and § 20-1013, compensatory damages in an amount to be proven at trial and, because he alleges actual malice, punitive damages in an amount the jury finds sufficient to punish Lyft and to deter Lyft and others from the same conduct.

**8c. DENIAL OF NOTICE AND APP DATA**

85. Lyft's Terms provide for the collection of ride data and for in-ride recording (ECF 20-4 at 45 to 46). Lyft has never given Plaintiff the passenger's report, any ride data, or any account of what it holds about the ride. On April 25, 2023, its notice named no conduct and no step to cure. The Terms promise a driver notice and an opportunity to cure (ECF 20-4 at 25). Plaintiff received neither. Plaintiff alleges, on information and belief, that the ride data would show whether a report was made and what was said in the ride.

85A. The same practice continued in October 2026. On October 7, 2026, Plaintiff sent a written arbitration opt-out notice to Lyft at arbitrationoptout@lyft.com. On October 21, 2026, Lyft told the Court that it "received all three opt-out notices" *[Counsel for Lyft, Sarah A. Belger, ECF 23 at 2, October 21, 2026]*. The supplemental declaration filed with that reply mentions no opt-out notice *[Lyft declarant, Senior Paralegal, Jeannie Lieu, ECF 23-1, October 21, 2026]*. Neither mentions the October 7, 2026 notice, which had been in Lyft's hands for fourteen days. Plaintiff had to answer by surreply (ECF 24).

85B. Plaintiff alleges that this is one continuing practice and not a series of separate acts: Lyft gave the passenger full service and a hearing, and it took no account of what Plaintiff sent. The practice began on April 25, 2023, and it continued through the fourteen days from October 7, 2026 to October 21, 2026.

85C. On the screen titled "Support chat history" in Plaintiff's Lyft app, the entries run to November 3, 2022 and then stop until March 31, 2026, a gap of 1,244 days that includes the whole period from April 25, 2023 to October 27, 2023 (Plaintiff's Exhibit 1, Page 20 of 20). Plaintiff cannot delete anything from that history, and he did not delete these sessions. Plaintiff alleges that Lyft deleted them, for reasons unknown to him.

85D. Under Md. Code, State Gov't § 20-304, Lyft "may not refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges of the place of public accommodation because of the person's race." Plaintiff alleges that Lyft withheld notice and app data from him because of his race, for the reasons stated in paragraphs 83 through 83F. Plaintiff seeks compensatory damages in an amount to be proven at trial and, because he alleges actual malice, punitive damages in an amount the jury finds sufficient to punish Lyft and to deter Lyft and others from the same conduct. Md. Code, State Gov't § 20-1013.

86. On severance, Plaintiff asks that the Clerk assign this Count its own civil action number, and that he be allowed to proceed in the severed action without prepaying fees or costs under 28 U.S.C. § 1915(a)(1), on the Application to Proceed in District Court Without Prepaying

Fees or Costs (Long Form), Form AO 239, which he will file with the Clerk. In the alternative, he asks to file that application within ninety (90) days after the Clerk assigns the number.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Steven Anthony Goforth respectfully requests that this Court enter judgment in his favor and against Defendant Lyft, Inc. on Counts I through VI and Count VIII, and, on Count VII, which is the claim of RiderTainment LLC, an entity that will appear through counsel, that the Court enter judgment in favor of RiderTainment LLC and against Defendant Lyft, Inc., and award the following relief:

(a) Compensatory damages to Plaintiff Steven Anthony Goforth for past and future lost earnings and income, including earnings lost during the 185-day wrongful deactivation;

(b) On Count VII, compensatory damages to RiderTainment LLC for Lyft's tortious interference with, and the destruction of, RiderTainment LLC, including the items of special damage stated in Count VII;

(c) Compensatory damages to Plaintiff Steven Anthony Goforth for past and future medical expenses, including the cost of spinal surgery, post-surgical rehabilitation, pain management, and lifetime care necessitated by the spinal condition that the wrongful deactivation caused, or substantially aggravated;

(d) Compensatory damages for future lost earning capacity as a result of that spinal condition;

(e) Compensatory damages for the loss of his housing, the damage to his credit and rental history, costs of relocation and storage, and other expenses caused by the wrongful deactivation;

(f) Compensatory damages for physical pain and suffering, past and future;

(g) Compensatory damages for severe emotional distress, past and future;

(h) Compensatory damages for loss of enjoyment of life;

(i) Compensatory damages for loss of dignity and humiliation;

(j) Punitive damages to Plaintiff Steven Anthony Goforth on Count VI, and on Count VIII under 42 U.S.C. § 1981 and Md. Code, State Gov't § 20-1013, in an amount sufficient to punish Defendant and to deter similar conduct in the future;

(k) An order under Fed. R. Civ. P. 21 severing Count VII and Count VIII from Counts I through VI, and directing the Clerk to assign each severed count its own civil action number, related to this action under Local Rule 103.1.b; and, in the severed action on Count VIII, in which Plaintiff Steven Anthony Goforth is the plaintiff, granting him leave to proceed without prepaying fees or costs under 28 U.S.C. § 1915(a)(1) on his Application to Proceed in District Court Without Prepaying Fees or Costs (Long Form), Form AO 239, which he will file with the Clerk; or, in the alternative, providing that he may file that application in the severed action within ninety (90) days after the Clerk assigns its number, and that the severed action will not be dismissed or delayed for want of prepayment while the application is pending. RiderTainment LLC, the plaintiff on Count VII, will address its own filing fee through counsel;

(l) On Count VIII (8b), injunctive relief under 42 U.S.C. § 12188(a), requiring Lyft to modify its policies and to provide drivers with disabilities a way to decline assisted rides and to let passengers know of the disability;

(m) Pre-judgment and post-judgment interest at the applicable legal rate; and

(n) Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Steven Anthony Goforth demands a trial by jury on all issues so triable. Plaintiff expressly preserves his right to trial by jury.

Respectfully submitted,

____________________________________


Steven Anthony Goforth
2026-28 Declared Congressional Candidate
United States House of Representatives
Virginia's 10th Congressional District
FEC Committee ID: C00941302
FEC Candidate ID: H6VA10241
42020 Village Center Plaza, Suite 120-721
Aldie, Virginia 20105
Campaign: campaign@stevengoforth.com
Case and Service: theuppityninja@gmail.com


Date: 11-10-2026

**CERTIFICATE OF SERVICE**

I certify that on November 10, 2026, I submitted for filing through the Court's Electronic Document Submission System Plaintiff's Motion for Leave to File First Amended Complaint, the Memorandum in Support, the [Proposed] Order, this First Amended Complaint, the Exhibit Index, and Plaintiff's Exhibits 1 to 5.

Within 24 hours after the Clerk dockets these documents, I will email a copy of each, bearing the Court's docket header, with the notice of electronic filing, to counsel for Defendant Lyft, Inc.: Sarah A. Belger, Holland & Knight LLP, 1650 Tysons Blvd, Suite 1700, Tysons, Virginia 22102, Sarah.Belger@hklaw.com.

Steven Anthony Goforth
2026-28 Declared Congressional Candidate
United States House of Representatives
Virginia's 10th Congressional District
FEC Committee ID: C00941302
FEC Candidate ID: H6VA10241
42020 Village Center Plaza, Suite 120-721
Aldie, Virginia 20105
Campaign: campaign@stevengoforth.com
Case and Service: theuppityninja@gmail.com

Date: 11-10-2026